# United States Tax Court

T.C. Memo. 2024-1

JESSE ALVARADO AND ESTATE OF MARIA DE LOURDES
VELASQUEZ, DECEASED, JESSE ALVARADO, SPECIAL
ADMINISTRATOR,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 15059-18.                          Filed January 3, 2024.

————————

Jesse Alvarado and Estate of Maria de Lourdes Velasquez, Deceased, Jesse Alvarado, Special Administrator, pro sese.

*Paulmikell A. Fabian* and *Sarah A. Herson*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: The Commissioner of Internal Revenue (Commissioner) determined that Petitioners, Jesse Alvarado and Maria de Lourdes Velasquez, have federal income tax deficiencies of $892,461 and $746,337 for 2011 and 2012 (years in issue), respectively.[1] These deficiencies stem primarily from alleged unreported gross receipts and overstated costs of goods sold at Mr. Alvarado's used car sales business. The Commissioner further determined late-filing additions to tax under section 6651(a)(1)[2] of $222,014 and $186,514 for 2011 and 2012,

---

[1] Ms. Velasquez passed away in August 2021 after this case went to trial. Because all the relevant events occurred while she was alive, we continue to refer to Mr. Alvarado and Ms. Velasquez together as "Petitioners."

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation

[*2] respectively. For Mr. Alvarado only, the Commissioner determined civil fraud penalties under section 6663 of $669,346 and $559,753 for 2011 and 2012, respectively. In the event that the fraud penalties for Mr. Alvarado are not upheld for either or both years in issue, the Commissioner has determined as an alternative accuracy-related penalties. *See* I.R.C. § 6662(a). The Commissioner conveyed his deficiency and penalty determinations in two separate notices of deficiency, one with a salutation addressing only Mr. Alvarado and one with a salutation addressing only Ms. Velasquez.[3] Both notices were dated April 27, 2018.

After concessions by the parties (detailed below),[4] the issues for decision are as follows:

1. Whether Petitioners had unreported gross receipts of $1,223,387 and $24,294 for 2011 and 2012, respectively;

2. Whether Petitioners overreported costs of goods sold by $514,583 and $1,200,242 for 2011 and 2012, respectively;

3. Whether Petitioners overreported various expenses on Schedules C, Profit or Loss from Business (Sole Proprietorship), in the aggregate amounts of $37,052 and $103,705 for 2011 and 2012, respectively;

4. Whether Petitioners are liable for the section 6651(a)(1) late-filing additions to tax for one or both of the years in issue; and

---

references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[3] While it is clear from the context of the notice of deficiency containing the civil fraud penalties and alternative accuracy-related penalties that it was intended only for Mr. Alvarado, his notice was sent by certified mail to "Jesse Alvarado and Maria de Lourdes Velasquez a.k.a. Marylou Velasquez" and contained a continuation sheet and worksheets titled in both Petitioners' names. Similarly, the notice of deficiency intended only for Ms. Velasquez, which determined late-filing additions to tax but no penalties, was sent by certified mail to "Jesse Alvarado & Maria de Lourdes Velasquez a.k.a. Marylou Velasquez" with worksheets titled in both their names.

[4] Before trial the parties agreed that Ms. Velasquez qualifies under section 6015(b) for "innocent spouse" relief from joint and several liability for the tax deficiencies at issue and the section 6651(a)(1) additions to tax.

[*3]    5.    Whether Mr. Alvarado is liable for the section 6663 civil fraud penalties or, alternatively, the section 6662 accuracy-related penalties for one or both of the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. By this reference we incorporate the parties' First Stipulation of Facts and the accompanying Supplements and Exhibits. Mr. Alvarado and Ms. Velasquez resided in California when they timely filed their Petition.

I.    *South Bay Autos and Alvarado Tax Service*

Mr. Alvarado worked as a commercial lender at Comerica Bank for approximately 25 years before opening a used car sales business, South Bay Autos (South Bay), which he operated as a sole proprietorship from 2008 to 2014. Mr. Alvarado rented premises in Hawthorne, California, to sell used cars and (as a side business) to prepare tax returns. He held a preparer tax identification number (PTIN) from the Internal Revenue Service (IRS) from 2009 through at least 2012, and he prepared several dozen tax returns during the years in issue under the business name Alvarado Tax Service. His tax return clients were primarily South Bay customers, whom he charged in the range of $60–$200 for the additional service.

Mr. Alvarado's business model at South Bay relied heavily on credit, both for his own inventory purchases and for his customers'. Mr. Alvarado bought much of his inventory at used car auctions using loan proceeds from Dealer Services Corp. (DSC). DSC merged with another company sometime in 2013 to form NextGear Capital (NextGear). Mr. Alvarado would need to pay back these purchase loans within 45 days or otherwise face high interest charges from DSC (and, later, NextGear).

Mr. Alvarado therefore wanted to sell his inventory quickly; yet his potential customers from the Hawthorne area often had limited income. To address this problem, Mr. Alvarado contracted with Topaz Financial Services (Topaz), and later with Premier Auto Credit (Premier), to provide credit to his customers. In a typical sale, Mr. Alvarado and the customer would sign a sales contract, with the customer making a small downpayment; then Mr. Alvarado would assign the contract to Topaz (or later to Premier) in exchange for advance payment as further detailed below. The customer would make all subsequent payments directly to the financer.

[*4] For his part, Mr. Alvarado took the used car sale contracts periodically (and typically in batches) to the financers, who would pay him the face value of the contracts less (1) a reserve amount, which Mr. Alvarado would receive only once the customer fully paid the loan balance, and (2) the outstanding value of any previous contracts that had become uncollectible in the meantime. The financers deducted the latter amount pursuant to Mr. Alvarado's agreement to fully guarantee each customer's loan. This business model eventually became financially unsustainable, and Mr. Alvarado closed South Bay in or around 2014, after drawing on his pensions and personal savings.

## II.   *Tax Returns*

Mr. Alvarado prepared and filed his and Ms. Velasquez's joint federal income tax returns for tax years 2009 through 2012, all of which were filed late. The 2011 return was due on April 17, 2012, but was not filed until February 4, 2013. The 2012 return was due on April 15, 2013, but was not filed until June 27, 2014. Mr. Alvarado and Ms. Velasquez neither filed for nor received an extension of time to file their returns for either of the years in issue.

The 2011 and 2012 joint returns did not separately identify income from Alvarado Tax Service, although such income was minimal. Those returns likewise did not report the income Petitioners earned from subleasing real estate for a few months in 2012. Other than these small amounts, Petitioners' only taxable income (and the only income reported on their returns) came from South Bay used car sales.

Mr. Alvarado attached Schedules C to the 2011 and 2012 joint returns, reporting various categories of income and expenses for South Bay, along with calculations of costs of goods sold. On both Schedules C, all original entries (excluding the results of arithmetic operations on some entries) end in "0" or "5." The 2011 Schedule C reported net profit of $13,900, while the 2012 Schedule C reported net profit of $30,035. After application of personal deductions, personal exemptions, the earned income tax credit, and/or the child tax credit (but no withholding or estimated tax payments), Petitioners claimed a refund due of $4,405 for 2011 and $281 for 2012.

## III.   *IRS Examination*

Petitioners' 2011 joint income tax return was selected by the IRS for audit in or around 2014. Marianna Kaplan (RA Kaplan), the IRS

[*5] revenue agent who primarily conducted the 2011 examination, was subsequently assigned to audit Petitioners' 2012 joint return as well.

Petitioners failed to reply to RA Kaplan's initial letter requesting a meeting. After RA Kaplan sent a followup letter demanding a meeting on a particular date as well as production of relevant documents, Petitioners (or their representative at the time) called to reschedule the meeting twice. When RA Kaplan finally met Mr. Alvarado at South Bay's business premises, he did not have any of the requested documents available for her. He kept no books or records for the business other than "car jackets," which RA Kaplan examined at a subsequent visit. Each car jacket was a folder containing dozens of documents relating to Mr. Alvarado's sale of a particular car, such as copies of the sale contract and financing agreement; some also contained evidence of his original inventory purchase. Mr. Alvarado kept the car jackets in boxes, roughly separated by year of purchase but not otherwise organized. Each jacket indicated the car's date of sale to a customer and its vehicle identification number (VIN), a unique 17-character identifier assigned to any on-road vehicle sold in the United States. RA Kaplan found 265 car jackets for cars sold in 2011 and 300 for 2012.

Mr. Alvarado represented to RA Kaplan that he used the car jackets to compute his income as reported on Petitioners' tax returns. RA Kaplan accordingly used the car jackets to sum the purchase prices of cars sold by South Bay during the years in issue. Using this method, RA Kaplan calculated gross sales of $2,764,693 in 2011 and $2,765,744 in 2012. These amounts exceeded the gross receipts reported on Petitioners' returns: $1,815,410 for 2011 and $2,538,525 for 2012.

Since many of the car jackets also contained invoices for South Bay's original purchases of the cars, and since Mr. Alvarado provided no other documents or records relating to his purchases, RA Kaplan also tallied the invoices. However, she excluded all invoices with purchase dates before 2011 because Mr. Alvarado kept no inventory records, and she could not determine whether he had already deducted the cost of these pre-2011 cars for the years he bought them. RA Kaplan's review of the invoices yielded costs of goods sold calculations of $156,165 for 2011 and $434,930 for 2012. These amounts were considerably lower than those reported on Petitioners' returns: $1,515,510 for 2011 and $2,146,780 for 2012.

**[*6]** To investigate these discrepancies, RA Kaplan summoned complete deposit and expenditure records (including images of canceled checks) for Mr. Alvarado's accounts with Comerica Bank and Bank of America during the years in issue. RA Kaplan tallied these deposits and debits, excluding deposits that appeared to be nontaxable (such as refunds) and excluding debits that appeared to be nondeductible (such as restaurant meals and clothing purchases). RA Kaplan also excluded debits that appeared to be for car inventory purchases unless the VIN matched that of a car which, according to the car jackets, was sold in 2011 or 2012. RA Kaplan conducted this bank accounts analysis without help or input from Petitioners, as they had stopped cooperating and refused to meet with her except when officially summoned.

After some adjustments made during Petitioners' internal appeal with the IRS and in this litigation (as described below), the updated bank accounts analysis yielded taxable deposits of $3,038,797 in 2011 and $2,562,819 in 2012 and costs of goods sold of $1,000,927 in 2011 and $946,538 in 2012. As explained above, these calculations of costs of goods sold do not include any amount for cars that South Bay sold in either year in issue but for which Mr. Alvarado could not substantiate a purchase with a matching VIN.

IV.  *IRS Appeals and Pretrial Discovery*

During Petitioners' internal appeal with the IRS, Mr. Alvarado continued his pattern of canceling meetings and providing requested documents late or incompletely if at all. However, he did produce several documents of potential relevance to redetermining Petitioners' income. First, he submitted dealer statements from NextGear and buyer receipts from AutoNation Auto Auction and South Bay Auto Auction[5] (together, auto auctions). The NextGear statements list by VIN all cars that South Bay purchased during the years in issue using loans from NextGear. The buyer receipts list by VIN some of the cars South Bay purchased from the auto auctions during the years in issue. RA Kaplan crosschecked the VINs from these statements and buyer receipts with the VINs appearing in the 2011 and 2012 car jackets. When she found a match for a car whose car jacket did not include a purchase invoice, she added the purchase price from the statements or receipts to her calculation of cost of goods sold.

---

[5] South Bay Auto Auctions is not related to Mr. Alvarado's South Bay business.

[*7] Additionally, before trial Mr. Alvarado came forward with 8 canceled checks from 2011 and 22 from 2012, each written by South Bay to an auction house for a car included in the car jackets but not previously included in RA Kaplan's calculations of costs of goods sold. The Commissioner added the amounts of these checks to RA Kaplan's totals, yielding costs of goods sold of $1,000,927 for 2011 and $946,538 for 2012.

During the internal IRS appeal, Mr. Alvarado also submitted several hundred pages of printouts from his account with DealerCenter, an inventory management system for car dealers. The printouts contain information on several hundred cars South Bay purchased during the years in issue, including VIN, purchase price, original purchase date (that is, the date on which South Bay acquired the car), and the "asking price" for sale to customers. However, there is no indication in these records of when, if ever, the cars were sold to customers nor whether the "asking price" matched the eventual sale price. Mr. Alvarado and his employees created these records contemporaneously with inventory purchases in the years in issue.

Some of the cars listed in the DealerCenter records have VINs matching those in the car jackets that Mr. Alvarado supplied to RA Kaplan during the examination. At trial Mr. Alvarado submitted supplemented versions of RA Kaplan's spreadsheets, in which he added purchase prices for cars whose VINs appeared in both the car jackets and the DealerCenter records but whose purchase prices RA Kaplan had not previously recorded. The Commissioner refused to recognize these additional claimed inventory purchases, on grounds of suspicion about the authenticity of the DealerCenter printouts.

Before trial Mr. Alvarado also produced quarterly summary reports for the years in issue prepared contemporaneously by Topaz for South Bay. Each quarterly report contains (1) a listing of the car contracts (by selling date and dollar amount) that South Bay sold to Topaz during that quarter, (2) a listing of the payments that Topaz actually made to South Bay during the quarter, (3) a listing of all outstanding loans (by borrower name, VIN, and outstanding loan balance) originated by South Bay but which Topaz deemed uncollectible during that quarter, and (4) a listing of all beginning and outstanding loan balances (by loan date, car model and year, borrower name, and beginning and outstanding loan balances). The reports show a total of 291 car purchases that Topaz financed for South Bay customers in 2011 and 160 purchases financed in 2012.

**[*8]**    RA Kaplan's bank accounts analysis included canceled checks that South Bay wrote to Topaz totaling $111,006 in 2011 and $80,519 in 2012. The Commissioner made no adjustments to either gross receipts or cost of goods sold on account of the Topaz reports or the canceled checks.

Finally, before trial Mr. Alvarado produced transaction summaries prepared by Premier for approximately 80 car loans that Premier purchased from South Bay between June and December 2012. Each summary lists (among other things) the original loan balance, the amount paid to South Bay (as reduced by various offsets, including a reserve withheld—at least initially—by Premier), the date of payment to South Bay, borrower name, car model and year, and VIN. Again, the Commissioner made no adjustments to RA Kaplan's bank accounts analysis on account of the Premier transaction summaries.

V.    *Final Deficiency Determinations*

After the agreed adjustments made during the internal IRS appeal and the discovery period of litigation, RA Kaplan revised her bank accounts analysis to yield the following calculations of Schedule C gross income, which the Commissioner asks us to uphold:

| [*9] | 2011 | | 2012 | |
|---|---|---|---|---|
| | *Form 1040, Schedule C* | *Determined by the IRS* | *Form 1040, Schedule C* | *Determined by the IRS* |
| Gross Receipts | $1,815,410 | $3,038,797 | $2,538,525 | $2,562,819 |
| Cost of Goods Sold | (1,515,510) | (1,000,927) | (2,146,780) | (946,538) |
| Advertising | (107,620) | (60,922) | (144,250) | (114,015) |
| Commissions | (8,880) | — | (48,500) | — |
| Insurance (other than health) | (8,250) | (1,548) | (7,800) | (1,015) |
| Legal and Professional Services | (17,220) | — | (18,200) | — |
| Office Expense | (4,250) | (14,945) | (4,800) | (8,370) |
| Rent | (113,100) | (109,283) | (103,500) | (103,497) |
| Taxes and Licenses | (4,180) | (169,834) | (4,440) | (119,484) |
| Utilities | (18,250) | (6,796) | (18,500) | — |
| Cell Phone | (4,250) | — | (6,220) | — |
| Occasional Help | — | — | (5,500) | — |
| Towing | — | (2,050) | — | (10,807) |
| Referral Fee | — | (177) | — | (600) |
| Refunds | — | (22,678) | — | (18,400) |
| Car and Truck Expenses | — | (239,263) | — | (228,480) |
| **Net Profit** | **$13,900** | **$1,410,374** | **$30,035** | **$1,011,613** |

**[\*10]** During this litigation, the parties stipulated the correctness of the expense amounts in RA Kaplan's bank accounts analysis (as reflected in the preceding table) in the following categories for both years in issue: advertising, office expenses, rent, taxes and licenses, towing, referral fee, refunds, and car and truck expenses. The parties also stipulated the correctness of RA Kaplan's calculation of utilities expenses for 2011.

## OPINION

I.  *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer with an income-producing activity or otherwise demonstrate that the taxpayer actually received income. *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *Id.* at 67–68.

II.  *Income Reconstruction*

If a taxpayer fails to maintain adequate records of income as required under section 6001, the Commissioner may reconstruct his income by any reasonable method that clearly reflects income. *See* I.R.C. § 446(b); *Holland v. United States*, 348 U.S. 121, 130–32 (1954); *Harper v. Commissioner*, 54 T.C. 1121, 1129 (1970). One indirect method of income reconstruction is a bank accounts analysis, incorporating both deposits and expenditures. We have long accepted bank accounts analysis as a reasonable reconstruction method. *See, e.g.*, *Nicholas v. Commissioner*, 70 T.C. 1057, 1064–65 (1978); *Harper*, 54 T.C. at 1129. While not conclusive, bank deposits are prima facie evidence of income. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986). The taxpayer bears the burden of showing that the deposits came from a nontaxable source. *See* Rule 142(a); *Harper*, 54 T.C. at 1129. For purposes of a bank accounts analysis, all money deposited into a taxpayer's account is presumed to be taxable unless the taxpayer can show otherwise. *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). However, the Commissioner must account

**[*11]** for any nontaxable deposits or deductible expenses of which he is aware. *Id.*

Mr. Alvarado failed to maintain adequate records of South Bay's income. The collection of car jackets he provided to RA Kaplan was patently incomplete, as indicated by the large gap for each year in issue between (a) the sum of sale prices listed in the jackets and (b) RA Kaplan's bank accounts analysis of gross receipts. (Indeed, Mr. Alvarado himself conceded as much.) The number of car jackets for 2011 (265) is considerably less than the number of car purchases financed by Topaz that year (291).

The other records Mr. Alvarado produced during the IRS internal appeal and this litigation are likewise insufficient to compute net income. The DealerCenter records do not indicate when (if ever) a car was sold or the amount of South Bay's gross receipts for any sale. Neither the Topaz reports nor the Premier transaction summaries indicate how much South Bay originally paid for the cars it sold to customers. And the Topaz quarterly reports contain VINs only for the cars whose buyers defaulted on their loans. Overall, we cannot generally match the gross receipts that South Bay received from Topaz or Premier with other evidence in the record concerning South Bay's purchase prices for its inventory (i.e., cost of goods sold). If all these pieces of evidence could somehow be collated to yield full and accurate records of South Bay's net profit (which appears unlikely), Mr. Alvarado has made no effort to show us how. We therefore generally accept the Commissioner's reconstruction of Petitioners' net income via RA Kaplan's bank accounts analysis, subject to certain adjustments discussed below.

A. *Gross Receipts*

Mr. Alvarado disputes the Commissioner's refusal to reduce South Bay's gross receipts by the sum of payments from South Bay to Topaz: $100,313 in 2011 and $80,519 in 2012. Mr. Alvarado testified at trial that these amounts represented downpayments that customers made to South Bay and that South Bay then remitted to Topaz when Topaz purchased those customers' loans. On brief the Commissioner argues that Mr. Alvarado failed to show a paper trail of funds moving from customers to Topaz via South Bay, with one exception: One customer made a downpayment of $395 to South Bay on November 2, 2011, while a check (written close in time) from South Bay to Topaz on November 7, 2011, for $827.42 includes a written breakdown for (in

[*12] part) $394.78 corresponding to a loan number that matches a loan on one of the contemporaneous Topaz quarterly reports.

We found credible Mr. Alvarado's testimony that the only payments South Bay made to Topaz were related to customer downpayments. On this point we return to the bank accounts analysis on which South Bay's income was reconstructed and reiterate that a taxpayer may bring forward proof that certain deposits should not be considered taxable. Where, as here, payments were made back to Topaz for customer deposits related to sales contracts assigned to Topaz and funded by Topaz, the corollary return of a portion of that funding should reduce gross income.

In addition, Mr. Alvarado argues that we should reduce South Bay's gross receipts by the full amount of the Topaz "returned loans"— that is, the outstanding balances of customers who defaulted on the loans that Topaz acquired, as listed in the quarterly summary reports. South Bay guaranteed these loans. However, each quarterly summary report reduces South Bay's "Total Accounts Receivable" by "Total Returns," indicating that (at least in many cases) Topaz simply offset its payments to South Bay for new loans by a running total of previously purchased loans that had gone into default. In that case, South Bay would not transfer money to Topaz to make good on its guaranty of the customers' loans; rather, its gross receipts from Topaz would already reflect the reduction. Therefore, reducing South Bay's gross receipts by the amount of the returned loans would effectively give Petitioners a double deduction.

We therefore modify the Commissioner's bank accounts analysis to account for the proven payments from South Bay to Topaz ($100,313 in 2011 and $80,519 in 2012), yielding gross receipts of $2,938,484 for 2011 and $2,482,300 for 2012.

B. *Cost of Goods Sold*

Cost of goods sold is a reduction made in the course of computing gross income. Treas. Reg. § 1.61-3(a). It is not a deduction and so is not subject to the limitations of section 162, which generally denies a deduction for business expenses unless they are "ordinary and necessary" for the business in question. *See, e.g.*, *Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 661 (1987); *Nunn v. Commissioner*, T.C. Memo. 2002-250, 84 T.C.M. (CCH) 403, 408. In the case of cash basis taxpayers such as Petitioners, the cost of goods sold reduces gross

**[\*13]** income only for the tax year when cash or other property is received in exchange for the goods. *See* Treas. Reg. § 1.61-3(a) ("[A]n amount cannot be taken into account in the computation of cost of goods sold any earlier than the taxable year in which economic performance occurs with respect to the amount . . . .").

A taxpayer is required to maintain sufficient permanent records to substantiate all components of reported net income, including cost of goods sold. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a), (e). However, the Court may estimate cost of goods sold under a variation of the *Cohan* rule, *see Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930), even when cost of goods sold is not fully substantiated, provided that there is a reasonable basis for making such an estimate, *Olive v. Commissioner*, 139 T.C. 19, 34 (2012), *aff'd*, 792 F.3d 1146 (9th Cir. 2015). Under the *Cohan* rule, if a taxpayer adequately establishes that he paid or incurred a deductible expense but does not establish the precise amount, then the Court may in some instances estimate the allowable deduction. *Cohan v. Commissioner*, 39 F.2d at 543–44. But the taxpayer must provide some reasonable basis for such an estimate. *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). In making an estimate under the *Cohan* rule, the Court "bear[s] heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 544. While the *Cohan* rule by its terms applies to deductible expenses, this Court has adapted it to estimate cost of goods sold as well. *See, e.g.*, *Olive*, 139 T.C. at 34; *Alterman v. Commissioner*, T.C. Memo. 2018-83, at \*30–31; *Huzella v. Commissioner*, T.C. Memo. 2017-210, at \*7–9.

The Commissioner's final position on brief is that Petitioners are entitled to cost of goods sold of $1,000,927 for 2011 and $946,538 for 2012. These amounts comprise the purchase prices of all cars for which Mr. Alvarado provided proof of both purchase and sale in 2011 or 2012, as identified by matching VINs. The Commissioner did not allow cost of goods for any purchases occurring before 2011, out of concern that Mr. Alvarado may have immediately deducted such purchases. As a result, the Commissioner takes the extreme position that many of the used cars sold in the years in issue had no inventory cost whatsoever. The Commissioner's analysis results in costs of goods sold of 34% of sales for 2011 and 38% for 2012, making gross margins for South Bay's used cars sales in the years in issue well over 60%, an implausible amount.

We hold that the law does not require this bizarre result. Rather, we include in South Bay's costs of goods sold for the years in issue the

[*14] purchase prices of any cars sold in those years for which Mr. Alvarado provided credible records along with an estimate of the cost of other cars sold during the years in issue for which we can conservatively estimate an inventory cost. For this purpose, we find the DealerCenter printouts credible as contemporaneous business records: For several hundred cars, they list VIN, car model and year, mileage, vehicle cost, date in stock, and asking price. There is nothing facially suspicious about them. The Commissioner objected to these records for the following reasons: (1) Mr. Alvarado never provided or mentioned these records during the examination; (2) some of the printouts list a "Date in Stock" of January 1, 2011, yet it seems unlikely that auto auctions were open on a national holiday; and (3) some of the printouts list a "Days in Stock" number of around 3,000, approximately the number of days between early 2011 and mid-2019, when Mr. Alvardo first provided the printouts to the IRS. The Commissioner suggests that Mr. Alvarado may have retroactively generated these records for purposes of his internal appeal with the IRS, casting serious doubt on their accuracy.

The Commissioner's concerns ultimately are unconvincing. Mr. Alvarado credibly testified that he subscribed to and used DealerCenter during the years in issue. Only about five records out of several hundred list a Date in Stock of January 1, 2011. Two records list a Date in Stock of January 1, 2012. As well, it appears that all the printouts listing "Days in Stock" of over 3,000 also list the "Vehicle Status" as "In Inventory." (Those with a Vehicle Status of "Sold" tend to list Days in Stock of under 200.) This is not surprising considering Mr. Alvarado's testimony that he printed the records during his internal appeal with the IRS, after temporarily regaining access to his DealerCenter account (for which he had stopped paying years earlier). It stands to reason that the records, accessed years later, would contain apparent temporal anomalies for cars that Mr. Alvarado or his employees had never marked "Sold." Overall, we find it more likely than not that the DealerCenter records are authentic and reliable, despite Mr. Alvarado's somewhat confused answers to questions at trial about why he did not provide them to RA Kaplan during the initial examination.

Mr. Alvarado submitted to the Court a marked-up version of RA Kaplan's car purchase spreadsheets, adding purchase prices that she did not include (typically because the purchase date was pre-2011) but that appeared under matching VINs in the DealerCenter printouts. For the reasons stated above, we accept these additions to South Bay's cost of goods sold for the years in issue, except for (1) a $3,000 purchase price for a 1998 Toyota Sienna sold on September 4, 2012, and (2) a $3,595

[*15] purchase price for a 2000 Toyota Camry sold on May 20, 2012. RA Kaplan's spreadsheets indicate that these same cars were previously sold on May 13 and January 20, 2012, respectively, leading us to conclude that the initial customers returned the vehicles or that South Bay repossessed them. In either case South Bay should receive an addition to cost of goods sold for these cars only once. We also have cross-checked the low-outlier purchase prices on RA Kaplan's spreadsheets (with a purchase-to-sales price ratio of under 0.1) with the DealerCenter printouts. Having found two discrepancies, we increase the purchase price of a 2004 Chrysler Pacifica (sold on November 13, 2012) from $493.77 (per RA Kaplan's spreadsheets) to $5,740 (per DealerCenter), and we increase the purchase price of a BMW 5 Series (sold on November 20, 2012) from $642.97 (per RA Kaplan's spreadsheets) to $6,340 (per DealerCenter).[6]

These additions yield tentative costs of goods sold of $1,224,593 for 2011 and $1,238,416 for 2012, as more thoroughly detailed at Appendixes A and B. However, we cannot take these figures as final because the cars whose purchase prices are included in these figures (hereafter, purchase-verified cars) clearly do not account for all of South Bay's gross receipts for the years in issue. For instance, when we sum the sale prices (based on the contracts in the car jackets) of the purchase-verified cars, we arrive at gross receipts of $2,139,642 for 2011 and $2,298,644 for 2012. These sums are substantially lower than the gross receipts we found above ($2,938,484 for 2011 and $2,482,300 for 2012). Further, South Bay's actual gross receipts for the purchase-verified cars are almost certainly lower still: Mr. Alvarado's testimony, the Topaz reports, and the Premier summaries all demonstrate that South Bay often received only a fraction of a car's jacket-listed sale price (at least during the year of sale), because of a combination of (1) the financers' policy of holding back a reserve amount and (2) the frequency of customer defaults on their loans (in which case South Bay had to reimburse the financers).

Since the purchase-verified cars clearly do not account for all of South Bay's gross receipts, our foregoing estimates of cost of goods sold—which were based only on the purchase-verified cars—are inadequate. *See Cohan v. Commissioner*, 39 F.2d at 544 ("[T]he Board

---

[6] On the marked-up versions of RA Kaplan's spreadsheets, Mr. Alvarado added some missing purchase prices by citing copies of canceled checks rather than the DealerCenter printouts. We ignore these citations because the checks either match the DealerCenter printouts or do not indicate either VIN or car model/year.

**[\*16]** [of Tax Appeals] should make as close an approximation as it can . . . . [T]o allow nothing at all appears to us inconsistent with saying that something was spent."). We must estimate the gaps between the gross receipts from the purchase-verified cars and the total gross receipts we found above, and then extrapolate cost of goods sold figures for the unrecorded car sales responsible for the gap.

However, even our first step—estimating the gaps—is not straightforward. Mr. Alvarado was unable to show the Court what South Bay's actual gross receipts were for any of the purchase-verified cars, and the records he submitted do not clearly reveal this information. (For instance, the Topaz reports do not indicate the VINs or models of the cars whose sales contracts were assumed by Topaz, nor how much Topaz paid for these contracts individually.) It might be possible to infer South Bay's actual gross receipts for some of the purchase-verified cars by cross-checking the copies of canceled checks paid to South Bay, the Topaz reports, the Premier summaries, and RA Kaplan's spreadsheets (as supplemented by Mr. Alvarado). However, we will not do Mr. Alvarado's work for him. His burden of proof includes the burden of clearly explaining how admissible evidence supports his case, and he . . . may not merely "dump" data for the Court to wade through on its own. "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to 'spell out [his] arguments squarely and distinctly,' or else forever hold [his] peace." *Rivera-Gomez v. De Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (quoting *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988)); *see also Hale v. Commissioner*, T.C. Memo. 2010-229, 100 T.C.M. (CCH) 345, 347 ("We need not (and shall not) undertake the task of sorting through the voluminous evidence [the taxpayer] has provided in an attempt to see what is, and what is not, adequate substantiation of the items on [the taxpayer's] return.").

Thus, for purposes of the *Cohan* rule as adapted to cost of goods sold, we will "bear heavily" on Mr. Alvarado, *see Cohan v. Commissioner*, 39 F.2d at 544, in part by assuming that South Bay's actual gross receipts for each purchase-verified car equaled the sale price for that car listed in the car jacket. Accordingly, we estimate gross receipts from the purchase-verified cars of $2,139,642 for 2011 and $2,298,644 for 2012. *See* Appendixes A and B. However, our assumption leaves us with gross receipts gaps of $798,842 in 2011 and $183,656 in 2012—receipts that we have not yet associated with any cost of goods sold.

**[*17]** At this point the *Cohan* rule turns a friendlier eye on Mr. Alvarado, as we may estimate some associated costs of goods sold for the gross receipts in the gaps, provided some reasonable basis exists for doing so. *See Cohan v. Commissioner*, 39 F.2d at 544; *Huzella v. Commissioner*, T.C. Memo. 2017-210, at *7–9 (estimating cost of goods sold using eBay records and sales catalogs); *Arizaga v. Commissioner*, T.C. Memo. 2016-57, at *6–7 (estimating cost of goods sold for a restaurant that kept no relevant records); *Heinbockel v. Commissioner*, T.C. Memo. 2013-125, at *67–68 (estimating cost of goods sold for a personal shopping business at 50% of gross receipts).

As a threshold matter, we do have proof that for the following gross receipts there was no associated cost of goods sold or that there is no reasonable basis for estimating such cost: (1) $5,500 from the September 4, 2012, resale of a 1998 Toyota Sienna (as discussed above); (2) $7,900 from the May 20, 2012, resale of a 2000 Toyota Camry (as discussed above); (3) $2,350 of fees charged to Alvarado Tax Service customers for preparation of tax returns in 2012; and (4) $2,580 from a subtenant at South Bay's business premises in Hawthorne, California in 2012. We are then left with $798,842 of gross receipts for 2011 and $165,326 of gross receipts for 2012 that appear to derive from car sales but for which we have not yet made any provision for costs of goods sold.

In analyzing the costs of goods sold for which we do have data, we note that the figures range from a low of 5% to over 100% of the ultimate sale prices, with an average cost of goods sold margin of 56.4% in 2011 and 54.2% in 2012. *See* Appendixes A and B. Using these average margins as the basis for our estimate yields an average gross profit margin of around 45%, which is likely high given South Bay's financial struggles and ultimate demise. However, given that we "bear heavily" on Mr. Alvarado for his failure to keep adequate records, *see Cohan v. Commissioner*, 39 F.2d at 544, we will proceed with these reasonable estimates. Applied to the remaining gross receipts in the gap, a cost of goods sold margin of 56.4% yields an estimated $450,547 of additional cost of goods sold for 2011, and a cost of goods sold margin of 54.2% yields an estimated $89,607 of additional cost of goods sold for 2012. We add these estimates to the figures for the purchase-verified cars ($1,224,593 in 2011 and $1,238,416 in 2012) to find total cost of goods sold of $1,675,140 for 2011 and $1,328,023 for 2012.

**[*18]** C.    *Expenses*

The parties stipulated most of the Commissioner's revisions to South Bay's Schedule C expenses for both years in issue, which were based on RA Kaplan's bank accounts analysis. Unstipulated expense categories for both years in issue are the following: commissions, insurance (other than health), legal and professional services, and cell phone expense. For 2012, utilities and occasional help are also unstipulated.

At trial and on brief the only expense category Mr. Alvarado challenged was legal and professional services. He testified that he hired a lawyer, Larry Rucker, to defend him in a suit brought against South Bay under the Americans with Disabilities Act. We find this testimony credible and accordingly allow a legal and professional services deduction of $10,000 for 2011 and $5,000 for 2012, based on the checks paid to "Law Offices of Fred Rucker" summarized in RA Kaplan's bank account expenditures spreadsheets.

Since Mr. Alvarado did not dispute the Commissioner's determinations in any of the other unstipulated expense categories at trial or on brief, we conclude that Petitioners have abandoned the disagreements they raised in their Petition about these expenses. *See Nicklaus v. Commissioner*, 117 T.C. 117, 120 n.4 (2001).

D.    *Redetermined Net Profit*

After accounting for the foregoing adjustments to gross receipts, cost of goods sold, and expenses, we redetermine Schedule C net profit of $625,848 for 2011 and $544,609 for 2012. As stated earlier, Petitioners reported net profit of only $13,900 for 2011 and $30,035 for 2012.

19

| [*19] *2011* | *Form 1040, Schedule C* | *Determined by the IRS* | *Found by the Court* |
|---|---|---|---|
| Gross Receipts | $1,815,410 | $3,038,797 | $2,938,484 |
| Cost of Goods Sold | (1,515,510) | (1,000,927) | (1,675,140) |
| Legal and Professional Services | (17,220) | — | (10,000) |
| Other Expenses | (268,780) | (627,496) | (627,496) |
| **Net Profit** | **$13,900** | **$1,410,374** | **$625,848** |

| *2012* | *Form 1040, Schedule C* | *Determined by the IRS* | *Found by the Court* |
|---|---|---|---|
| Gross Receipts | $2,538,525 | $2,562,819 | $2,482,300 |
| Cost of Goods Sold | (2,146,780) | (946,538) | (1,328,023) |
| Legal and Professional Services | (18,200) | — | (5,000) |
| Other Expenses | (343,510) | (604,668) | (604,668) |
| **Net Profit** | **$30,035** | **$1,011,613** | **$544,609** |

III.   *Additions to Tax and Penalties*

The Commissioner determined section 6651(a)(1) late-filing additions to tax against Petitioners and section 6663 fraud penalties against Mr. Alvarado.[7] The Commissioner has also determined against

---

[7] The Commissioner's initial assertion of the section 6663 penalties, using Letter 950 (the "30-day letter"), did not distinguish between Mr. Alvarado and Ms.

**[\*20]** Mr. Alvarado, as an alternative to the fraud penalties, section 6662 accuracy-related penalties for underpayments of tax by reason of substantial understatements of income tax.

Under section 7491(c), the Commissioner bears the burden of production regarding penalties and additions to tax asserted against individuals and must come forward with sufficient evidence indicating that it is appropriate to impose them. *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). One part of this burden is to show compliance with section 6751(b)(1), which provides that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Petitioners have not disputed that the Commissioner satisfied the supervisory approval requirement, and we see no evidence in the record to suggest otherwise.

A.   *Section 6651 Late-Filing Additions to Tax*

Section 6651(a)(1) imposes an addition to tax for the failure to file a return on or before the due date (including extensions) unless the taxpayer can establish that such failure was "due to reasonable cause and not due to willful neglect." (After five months or more of delay, the addition equals 25% of the amount of tax otherwise due.) To demonstrate reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence but was nevertheless unable to file on time. *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1).

Petitioners filed their 2011 joint income tax return over 9 months late, and they filed their 2012 return over 14 months late. At trial Mr. Alvarado explained the late filings as the result of his being overwhelmed with South Bay business and of his need to await financial information from Topaz. However, this Court has held that work demands—even extreme ones—do not constitute reasonable cause for purposes of section 6651(a)(1). *Dustin v. Commissioner*, 53 T.C. 491, 507 (1969), *aff'd*, 467 F.2d 47 (9th Cir. 1972). And Mr. Alvarado failed to explain how, if at all, he used the Topaz reports to prepare the tax returns (which is not self-evident). We therefore sustain the

---

Velasquez. The notices of deficiency made clear that the fraud penalties did not apply to Ms. Velasquez by virtue of section 6663(c).

**[\*21]** Commissioner's imposition of the section 6651(a)(1) addition to tax on Mr. Alvarado.[8]

### B. *Section 6663 Fraud Penalties*

Section 6663(a) imposes a penalty equal to 75% of the taxpayer's underpayment of tax that is due to fraud. A taxpayer commits fraud when he intentionally contrives to evade a tax liability that he knows to be owing. *Maciel v. Commissioner*, 489 F.3d 1018, 1026 (9th Cir. 2007), *aff'g in part, rev'g in part* T.C. Memo. 2004-28; *Petzoldt v. Commissioner*, 92 T.C. 661, 698–99 (1989). If any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as fraudulent unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. I.R.C. § 6663(b). Section 6664(a) provides that for purposes of the fraud penalty, "underpayment" generally means "the amount by which any tax imposed by this title [i.e., the Code] exceeds . . . the amount shown as the tax by the taxpayer on his return."

The Commissioner has the burden of proving fraud by clear and convincing evidence. *See* I.R.C. § 7454(a); Rule 142(b). To carry that burden for a given tax year, the Commissioner must show that (1) an underpayment of tax exists for that year and (2) some part of the underpayment is attributable to fraud. *See* I.R.C. §§ 6663(a), 7454(a); *DiLeo*, 96 T.C. at 873. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *DiLeo*, 96 T.C. at 874. Fraud is never presumed and must be established by clear and convincing evidence of fraudulent intent. *Baumgardner v. Commissioner*, 251 F.2d 311, 322 (9th Cir. 1957), *aff'g* T.C. Memo. 1956-112. Since direct evidence of a taxpayer's fraudulent intent is seldom available, fraud may be shown by circumstantial evidence. *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *Petzoldt*, 92 T.C. at 699. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 210–11 (1992).

The circumstantial evidence by which the Commissioner may prove fraud includes various "badges of fraud" on which courts often rely. *See Bradford v. Commissioner*, 796 F.2d at 307; *DiLeo*, 96 T.C. at 875. These badges focus on whether the taxpayer engaged in certain

---

[8] Again, Ms. Velasquez is not liable for this penalty by virtue of the relief provided by section 6015(b), as conceded by the Commissioner.

**[\*22]** conduct that is indicative of fraudulent intent, such as (1) understating income, (2) failing to maintain adequate records, (3) offering implausible or inconsistent explanations, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) providing incomplete or misleading information to a tax return preparer, (8) filing false documents, including false income tax returns, (9) failing to file tax returns or filing them late, and (10) engaging in extensive dealings in cash. *See Bradford v. Commissioner*, 796 F.2d at 307–08; *Parks v. Commissioner*, 94 T.C. 654, 664–65 (1990). The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211. We may also consider a taxpayer's education, training, business experience, and knowledge of income tax laws in deciding whether he acted with fraudulent intent. *Worsham v. Commissioner*, T.C. Memo. 2012-219, 104 T.C.M. (CCH) 129, 134, *aff'd*, 531 F. App'x 310 (4th Cir. 2013); *see also Chico v. Commissioner*, T.C. Memo. 2019-123, at \*46–47, *aff'd*, No. 20-71017, 2021 U.S. App. LEXIS 30243 (9th Cir. Oct. 8, 2021).

We must now decide whether the Commissioner has introduced clear and convincing evidence that Mr. Alvarado has an underpayment (as defined in section 6664(a)) for each year in issue and that at least some portion of the underpayment for each year is due to fraud on Mr. Alvarado's part. We begin by noting the obvious implication of our deficiency analysis, that either Mr. Alvarado did not keep adequate records of South Bay's used car inventory purchases and sales or he did not provide such records to the Commissioner and this Court. In either event, under our caselaw we may accept a bank accounts analysis for South Bay's gross income and adapt the *Cohan* rule to estimate South Bay's costs of goods sold. Any reasonable application of these rules yields tax liabilities in excess of what Petitioners reported on their 2011 and 2012 returns (both of which showed a refund due, even before accounting for any withholding or estimated tax payments). We now clarify that the *Cohan* rule (and its adaptation to cost of goods sold) contributes to determining—rather than merely estimating—the tax imposed by the Code for those taxpayers who do not keep (or at least do not furnish) adequate financial records. Therefore, the Commissioner has satisfied his burden of proof for the first element of fraud: There is clear and convincing evidence that Mr. Alvarado did not keep (or furnish) adequate records for South Bay and that he underpaid his income tax for both years in issue within the meaning of section 6664(a).

[*23] However, our analysis in this case "b[ore] heavily" on Mr. Alvarado because his own behavior of keeping incomplete and scattered records created the need for estimates in the first place. In particular, we assumed (unfavorably to Mr. Alvarado) that for each of the purchase-verified cars South Bay received the full sale price listed in the contract in the car jacket. And we then assumed (unfavorably to Mr. Alvarado) that all cars other than the purchase-verified cars had average cost of goods sold margins relative to those of the purchase-verified cars (this latter margin being measured under the first unfavorable assumption). However, the Topaz reports and Premier summaries show it to be just as likely that South Bay received only fractions of the listed sale prices for most of the cars it sold, owing to the subprime financing arrangements for most customers.

If we use the Topaz-financed cars as a basis for estimating average receipts for all cars, we find an average of $7,145 per car in 2011 and $5,720 per car in 2012. (Topaz made total payments to South Bay of $2,079,310 for 291 contracts in 2011, and it paid $915,239 for 160 contracts in 2012.) Meanwhile, the purchase-verified cars had an average cost (that is, the price South Bay paid for them) of $6,123 in 2011 and $5,049 in 2012. Using those numbers, the cost of goods sold margin would be between 86% (in 2011) and 88% (in 2012), much higher than the figures we determined under the *Cohan* rule (56.4% in 2011 and 54.2% in 2012). The result would then be gross profit margins between 12% and 14%, which, after accounting for South Bay's expenses, would result in net losses rather than the profitability that we determined.

Because we find it just as likely that South Bay had negative net profit as positive net profit for both years in issue, we lack clear and convincing evidence that Mr. Alvarado believed he and Ms. Velasquez owed more tax than they reported and paid. Yet the second component of the section 6663 fraud penalty requires that the taxpayer *knew* (and thus believed) he owed more tax than he reported and paid. *See Petzoldt*, 92 T.C. at 698. If South Bay in fact had no positive net profit in either year, then given the evidence that Petitioners had no other substantial income in either year, Mr. Alvarado likely did not believe he and Ms. Velasquez owed any positive amount of income tax for either year.

Mr. Alvarado held a PTIN and prepared returns for some other taxpayers, and he was a commercial lender at Comerica Bank for over two decades. However, a trained tax professional in Mr. Alvarado's presumptive position—that is, palpably suffering business losses but

**[\*24]** devoid of the records to prove it—reasonably could have believed his business would not have tax liabilities for the years in issue. *Cf. Capp v. Commissioner*, T.C. Memo. 1968-53, 27 T.C.M. (CCH) 280, 283 ("[W]e must conclude here that the smattering of knowledge of taxation and accounting acquired in the [relevant] period and possessed by this [taxpayer] is not clear and convincing evidence of a specific intent to evade tax . . . ."). Because we find some probability that South Bay made zero or negative net profits for the years in issue, we find it meaningfully probable that Mr. Alvarado did not believe he and Ms. Velasquez were underreporting or underpaying their income tax.

True, Mr. Alvarado kept inadequate records for South Bay; he and Ms. Velasquez filed their tax returns late several years in a row; the various inputs on the Schedules C that Mr. Alvarado prepared for both years in issue appear to be estimated (as all amounts end in "0" or "5"); Mr. Alvarado initially failed to reveal to RA Kaplan that he prepared some tax returns for pay; and Mr. Alvarado repeatedly delayed meetings with IRS agents, sometimes failed to appear at meetings absent a summons, and only inconsistently complied with document requests (including during the lead-up to trial). We certainly do not condone any of these practices, and we admonish Mr. Alvarado for his poor behavior. Nonetheless, these facts are consistent with a mixture of negligence and being overwhelmed by his failing business venture. They do not add up to a compelling counterweight to the above considerations regarding the probability that Mr. Alvarado did not believe he underreported or underpaid his tax liabilities. The apparent fabrication of inputs on the Schedules C is perhaps the most concerning factor, but even this is consistent with Mr. Alvarado's having a rough sense of what South Bay's actual net profits were and trying to "reverse-engineer" those amounts on the tax returns (perhaps erring on the side of overestimation).

Although Petitioners underreported and underpaid their income tax liabilities, we lack clear and convincing evidence that Mr. Alvarado believed they owed more. Thus, we do not find him liable for the fraud penalty under section 6663.

### C.    *Section 6662 Accuracy-Related Penalties*

Section 6662 provides for a 20% accuracy-related penalty on an underpayment of tax attributable to (among other things) a substantial understatement of income tax. I.R.C. § 6662(a), (b)(2). An understatement of income tax generally means the excess of tax required to be reported on the return over the amount of tax shown on

**[\*25]** the return. I.R.C. § 6662(d)(2)(A). In the case of an individual, an understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. I.R.C. § 6662(d)(1)(A). Unlike the section 6663 fraud penalty, the accuracy-related penalty requires the Commissioner to carry the burden of production but not the burden of proof with respect to the accuracy-related penalty. I.R.C. § 7491(c); Rule 142(a); *Higbee*, 116 T.C. at 446–49. Given the amount of net profit that we have redetermined for each year in issue, Mr. Alvarado clearly has a substantial understatement of income tax for each year.

The accuracy-related penalty under section 6662(a) and (b)(2) does not apply if the taxpayer had reasonable cause for the substantial understatement and acted in good faith. I.R.C. § 6664(c)(1). Mr. Alvarado offered no evidence that he qualifies for the reasonable cause exception, and we see none in the record. Accordingly, we hold Mr. Alvarado liable for the accuracy-related penalty on his entire underpayment for each year in issue.

IV. *Conclusion*

We hold that for the years in issue, in addition to the Commissioner's concessions and before the application of section 6015(b) relief for Ms. Velasquez and her estate, Petitioners' gross income, cost of goods sold, and Schedule C expenses must be adjusted as redetermined above; and Petitioners are liable for the section 6651(a)(1) additions to tax. Mr. Alvarado is also subject to accuracy-related penalties under section 6662(a) and (b)(2) for both years in issue.

We have considered all the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

| [*26] | APPENDIX A – *2011* | | | | |
|---|---|---|---|---|---|
| VIN | Date of Sale | Car | Sales Price | Cost of Goods Sold (COGS) | COGS Margin |
| WAUED68D2WA058468 | 12/23/2011 | 98 Audi | $7,900.00 | $3,676.15 | 46.5% |
| IGYEC63T92R133421 | 2/12/2011 | 2002 Cadillac Escalade | $13,000.00 | $7,870.62 | 60.5% |
| 2FMZA5243BA92177 | 5/21/2011 | 2003 Ford Windstar | $7,900.00 | $3,800.00 | 48.1% |
| 2FTRX17W93CAG7941 | 8/13/2011 | 2003 Ford F-150 | $7,350.00 | $6,133.61 | 83.5% |
| 1GKEK63U73J314216 | 1/10/2011 | 2003 GMC Yukon | $13,900.00 | $7,918.15 | 57.0% |
| 4F2YZ0616SKM08491 | 12/28/2011 | 2005 Mazda Tribute | $8,700.00 | $5,000.00 | 57.5% |
| SAJEA51C03WD37041 | 11/12/2011 | 2003 Jaguar X-Type | $7,900.00 | $4,292.69 | 54.3% |
| 1GCCS19W028188575 | 9/2/2011 | 2002 Chevrolet S10 Ext | $9,500.00 | $4,770.03 | 50.2% |
| WBAGL63444DP71595 | 1/3/2011 | 2004 BMW 7 Series | $13,500.00 | $14,110.53 | 104.5% |
| WDBJF65J818384279 | 2/24/2011 | 2001 Mercedes-Benz | $9,900.00 | $6,009.58 | 60.7% |
| WDBUF70JX3A221796 | 3/12/2011 | 2003 Mercedes-Benz | $14,500.00 | $10,569.81 | 72.9% |
| WBABM3344YJN63035 | 6/3/2011 | 2000 BMW 3 Series | $6,900.00 | $4,400.00 | 63.8% |
| 2FMZA514828805546 | 8/28/2011 | 2002 Ford Windstar | $5,900.00 | $2,932.96 | 49.7% |
| WBANA735458818181 | 7/30/2011 | 2005 BMW 5 Series | $17,900.00 | $12,500.00 | 69.8% |
| 5UMEU27A21U066589 | 8/14/2011 | 2001 Lincoln Navigator | $7,000.00 | $6,080.00 | 86.9% |
| 1GNEK13R4WJ341993 | 6/25/2011 | 1998 Chevrolet Tahoe | $8,900.00 | $3,100.00 | 34.8% |
| 1GNDS135532299418 | 6/26/2011 | 2003 Chevrolet Trail Blazer | $7,540.33 | $5,300.00 | 70.3% |
| 1G6DM57N730145001 | 1/23/2011 | 2003 Cadillac CTS | $10,900.00 | $6,177.07 | 56.7% |
| SALTY15422A742641 | 10/20/2011 | 2002 Land Rover Discovery | $6,240.00 | $3,850.42 | 61.7% |
| 2GCEC19T7Y1159954 | 5/25/2011 | 2000 Chevrolet Silverado 1500 | $9,900.00 | $5,013.54 | 50.6% |

**[*27]**

| | | | | | |
|---|---|---|---|---|---|
| WBAGN63412DR07821 | 1/16/2011 | 2002 BMW 7 Series | $16,000.00 | $10,989.52 | 68.7% |
| 1GKEK63U91J237376 | 1/26/2011 | 2001 GMC Yukon | $11,900.00 | $5,900.00 | 49.6% |
| 1GNEC13T31R116676 | 2/20/2011 | 2001 Chevrolet Tahoe | $12,900.00 | $6,600.00 | 51.2% |
| JT88H68X8Y0024577 | 7/26/2011 | 2000 Lexus GS | $11,900.00 | $6,982.93 | 58.7% |
| 1GYEK63N12R03768 | 1/20/2011 | 2002 Cadillac Escalade | $13,400.00 | $8,100.00 | 60.4% |
| 1GCEK19T31E253904 | 9/4/2011 | 2001 Chevrolet Silverado 1500 | $7,600.00 | $4,679.22 | 61.6% |
| WDBRF61J81F071332 | 3/11/2011 | 2001 Mercedes-Benz C Class | $12,900.00 | $6,250.00 | 48.4% |
| 1GCEC19R4TE244357 | 9/26/2011 | 1996 Chevrolet 1500 Extended | $8,900.00 | $3,800.00 | 42.7% |
| WBAAM3346YCB24891 | 2/10/2011 | 2000 BMW 3 Series | $10,900.00 | $5,000.00 | 45.9% |
| 3GKEC16T12G358182 | 9/2/2011 | 2000 GMC Yukon XL 1500 | $10,900.00 | $6,200.00 | 56.9% |
| WDBNG75J72A254392 | 2/18/2011 | 2002 Mercedes Benz S Class | $12,900.00 | $6,500.00 | 50.4% |
| STBRN341X25314096 | 12/26/2011 | 2002 Toyota Tundra Access | $8,900.00 | $5,390.00 | 60.6% |
| SAJEA51DX2XC32685 | 3/12/2011 | 2002 Jaguar X-Type | $10,900.00 | $6,100.00 | 56.0% |
| JT6HF10UXX0030523 | 2/12/2011 | 1999 Lexus | $10,900.00 | $5,324.19 | 48.8% |
| 1FMZU63E72UA34725 | 3/7/2011 | 2002 Ford Explorer | $10,900.00 | $5,180.00 | 47.5% |
| WDBNG78J52A239126 | 8/5/2011 | 2002 Mercedes Benz S Class | $16,900.00 | $13,347.31 | 79.0% |
| JT8BD68S8X0074958 | 1/31/2011 | 1999 Lexus GS | $10,900.00 | $5,700.00 | 52.3% |
| 2GIFP22G8Y2128887 | 4/8/2011 | 2000 Chevrolet Camero | $11,900.00 | $7,192.95 | 60.4% |
| JT8BH68X7W0011610 | 7/28/2011 | 1998 Lexus GS | $12,900.00 | $6,500.00 | 50.4% |
| 2HKRL1862XH512692 | 110/4/11 | 1999 Honda Odyssey | $10,900.00 | $6,000.00 | 55.0% |
| WBAEV33452KL67097 | 8/25/2011 | 2002 BMW 3 Series | $11,250.00 | $5,736.70 | 51.0% |
| WBABM3345YJN81012 | 4/9/2011 | 2000 BMW 3 Series | $8,900.00 | $4,505.00 | 50.6% |
| 4TEJ062N86Z313083 | 2/22/2011 | 2006 Toyota Tacoma Double | $19,900.00 | $15,321.84 | 77.0% |

| [*28] | | | | | |
|---|---|---|---|---|---|
| JNKCV51E23M013611 | 11/19/2011 | 2003 Infiniti G | $10,900.00 | $6,200.00 | 56.9% |
| JTKDE177370159013 | 9/6/2011 | 2007 Scion TC | $12,900.00 | **$10,329.00[9]** | **80.1%** |
| WDBRF64JX2E002046 | 5/5/2011 | 2002 Mercedes Benz S Class | $10,900.00 | **$7,000.00** | **64.2%** |
| WDBNG70J72A242380 | 2/10/2011 | 2002 Mercedes Benz S Class | $13,900.00 | $6,700.00 | 48.2% |
| WBAFA5355ILM89729 | 4/8/2011 | 2001 BMW X5 | $15,900.00 | $9,168.55 | 57.7% |
| WAUDC68D61A114547 | 9/28/2011 | 2001 Audi A4 | $10,900.00 | **$5,540.00** | **50.8%** |
| WDBNG70J01A174051 | 11/26/2011 | 2001 Mercedes Benz S Class | $10,900.00 | $5,000.00 | 45.9% |
| 2C3HE6GX1H602336 | 1/27/2011 | 2001 Chrysler 300 | $6,900.00 | $3,542.84 | 51.3% |
| 1GNEC13V92R265824 | 8/14/2011 | 2002 Chevrolet Tahoe | $12,900.00 | $7,776.62 | 60.3% |
| 1LNHM87ASYY822595 | 7/16/2011 | 2000 Lincoln LS | $9,900.00 | **$4,695.00** | **47.4%** |
| WDBPJ78J92A019773 | 9/6/2011 | 2002 Mercedes Benz CL Class | $22,900.00 | $15,000.00 | 65.5% |
| 1GNEC16T831215183 | 8/19/2011 | 2003 Chevrolet Suburban 1500 | $13,900.00 | **$8,500.00** | **61.2%** |
| WDBNG70J5YA29033 | 9/15/2011 | 2000 Mercedes Benz S Class | $11,700.00 | $5,915.58 | 50.6% |
| 3GNCK18R5XG230638 | 8/11/2011 | 1999 Chevrolet Tahoe | $6,900.00 | $3,758.50 | 54.5% |
| 1GNEC13T83R248013 | 3/11/2011 | 2003 Chevrolet Tahor | $13,900.00 | $8,000.00 | 57.6% |
| 1FMEU15L83LA22622 | 5/8/2011 | 2003 Ford Expedition | $10,700.00 | $5,500.00 | 51.4% |
| 2FTZX07291CA68723 | 6/17/2011 | 2001 Ford F150 Super Cab | $9,900.00 | $6,266.05 | 63.3% |
| 2GIWF55E119254200 | 12/24/2011 | 2001 Chevrolet Impala | $6,900.00 | $900.71 | 13.1% |
| 1GNEC13T01J140318 | 1/20/2011 | 2001 Chevrolet Tahoe | $13,400.00 | $7,369.55 | 55.0% |
| 1FAFP33P82W225238 | 1/3/2011 | 2002 Ford Focus | $4,900.00 | **$5,900.00** | **120.4%** |
| 1FMCU04122KA15543 | 7/21/2011 | 2002 Ford Focus | $10,500.00 | $4,700.00 | 44.8% |

---

[9] COGS figures in bold (and the associated COGS margins) were reflected in the DealerCenter printouts but not in RA Kaplan's spreadsheets.

| [*29] | | | | | |
|---|---|---|---|---|---|
| 2MEHM75V73X625035 | 3/30/2011 | 2003 Mercury Marauder | $10,900.00 | $5,500.00 | 50.5% |
| 1FAFP34302W255300 | 10/30/2011 | 2002 Ford Focus | $7,900.00 | $3,300.00 | 41.8% |
| 1FMZU62E72Z837311 | 7/6/2011 | 2002 Ford Explorer | $7,900.00 | $4,747.06 | 60.1% |
| W06VR54R9VR153773 | 2/4/2011 | 1996 Cadillac Catera | $4,400.00 | **$2,500.00** | **56.8%** |
| WDBNG75J71A208897 | 6/9/2011 | 2001 Mercedes Benz S Class | $11,900.00 | $6,800.00 | 57.1% |
| WBAGL634X2DP56418 | 8/4/2011 | 2002 BMW 7 Series | $14,250.00 | $6,500.00 | 45.6% |
| WDBJF55F6VJ030620 | 6/1/2011 | 1997 Mercedes Benz E Class | $7,900.00 | $5,321.20 | 67.4% |
| 1GYEK1388XR413817 | 12/20/2011 | 1999 Cadillac Escalade | $8,800.00 | $3,675.00 | 41.8% |
| 4T3ZF19CXYU305151 | 2/20/2011 | 2000 Toyota Sienna | $7,900.00 | **$4,000.00** | **50.6%** |
| 1N4DL01D9XC230595 | 12/6/2020 | 1999 Nissan Altima | $2,900.00 | **$1,000.00** | **34.5%** |
| 1GYEK13R0YR165578 | 9/29/2011 | 2000 Cadillac Escalade | $10,900.00 | $5,000.00 | 45.9% |
| 1N4AL11D95N923502 | 4/25/2011 | 2005 Nissan Altima | $12,900.00 | $6,700.00 | 51.9% |
| JN8DR09X71W568112 | 2/15/2011 | 2001 Nissan Pathfinder | $9,900.00 | $4,300.00 | 43.4% |
| 1GCEC14V4YZ155179 | 1/13/2011 | 2000 Chevrolet Silverado 1500 | $10,900.00 | $5,324.19 | 48.8% |
| 2FMZA51686BA63385 | 2/12/2011 | 2006 Ford Freestar | $9,900.00 | $4,420.79 | 44.7% |
| WDBNG75J0YA060408 | 7/16/2011 | 2000 Mercedes Benz S Class | $13,900.00 | **$5,900.00** | **42.4%** |
| WBAAM5345YFR20538 | 1/15/2011 | 2000 BMW 3 Series | $9,900.00 | $2,950.00 | 29.8% |
| LITARN81A0RZ162721 | 12/19/2011 | 1994 Toyota Truck | $2,900.00 | **$1,000.00** | **34.5%** |
| JTHBF30GG25031425 | 8/1/2011 | 2002 Lexus ES | $14,900.00 | **$7,000.00** | **47.0%** |
| JM3LW28G2Y0112956 | 4/16/2011 | 2000 Mazda MPV | $5,900.00 | $3,400.00 | 57.6% |
| WDBNG70J0YA006422 | 3/6/2011 | 2000 Mercedes Benz S Class | $10,900.00 | $4,500.00 | 41.3% |
| JT8BD68S0X0064974 | 1/26/2011 | 1999 Lexus GS 300 | $9,900.00 | **$6,500.00** | **65.7%** |
| 2GCEK19T1X1263177 | 6/24/2011 | 1999 Chevrolet Silverado 1500 | $10,500.00 | $5,072.00 | 48.3% |

**[*30]**

| | | | | | |
|---|---|---|---|---|---|
| WBAAM3336YFP68460 | 6/10/2011 | 2000 BMW 3 Series | $7,089.00 | $4,951.67 | 69.9% |
| 1GKEC13RXXJ748972 | 2/8/2011 | 1999 GMC Yukon | $7,400.00 | $3,400.00 | 45.9% |
| 1G1ND52183M515735 | 6/14/2011 | 2003 Chevrolet Malibu | $7,900.00 | $3,987.96 | 50.5% |
| 1GNDS135222376115 | 6/19/2011 | 2003 Chevrolet Trail Blazer | $10,900.00 | $5,390.00 | 49.4% |
| 1GNEC13791R129556 | 12/8/2011 | 2001 Chevrolet Tahoe | $10,000.00 | **$5,900.00** | **59.0%** |
| 4JGAB54E51A247328 | 8/20/2011 | 2001 Mercedes Benz ML | $11,900.00 | $6,877.65 | 57.8% |
| 3VWSK69M93M012173 | 7/20/2011 | 2003 Volkswagen Jetta | $8,900.00 | $4,192.10 | 47.1% |
| 1GBDV13147D176215 | 8/30/2011 | 2007 Chevrolet Uplander | $8,900.00 | **$4,000.00** | **44.9%** |
| 1GKCC13T91R221865 | 8/10/2011 | 2001 GMC Yukon | $11,900.00 | **$6,000.00** | **50.4%** |
| JT8BH68X2Y0025675 | 2/2/2011 | 2000 Lexus GS | $10,900.00 | $5,200.00 | 47.7% |
| 3GNEC16T42G356851 | 11/29/2011 | 2002 Chevrolet Suburban | $9,900.00 | **$7,500.00** | **75.8%** |
| 1GKEC13R4XJ807790 | 2/6/2011 | 1999 GMC Yukon | $8,900.00 | $3,850.48 | 43.3% |
| 2GCEC19V021179665 | 2/25/2011 | 2002 Chevrolet Suburban | $9,300.00 | $4,405.00 | 47.4% |
| WDBNG70J9YA106275 | 9/30/2011 | 2000 Mercedes Benz S Class | $12,900.00 | $6,340.00 | 49.1% |
| JN8DR09X71WS68112 | 12/9/2011 | 2001 Nissan Pathfinder | $9,000.00 | **$4,300.00** | **47.8%** |
| 1GBFG15T341148789 | 5/9/2011 | 2004 Chevrolet Express 1500 | $14,900.00 | **$12,000.00** | **80.5%** |
| 5TBRT38121S140345 | 2/27/2011 | 2001 Toyota Tundra | $9,900.00 | $6,426.29 | 64.9% |
| 3GKEC16T4YG137345 | 3/26/2011 | 2000 GMC Yukon XL 1500 | $7,900.00 | $4,300.00 | 54.4% |
| 4JGAB72E01A241435 | 3/26/2011 | 2001 Mercedes Benz ML Class | $12,400.00 | $5,547.59 | 44.7% |
| SALME114X3A135410 | 4/3/2011 | 2003 Land Rover Range Rover | $18,999.00 | $11,250.00 | 59.2% |
| 1G6DM57N430143836 | 5/9/2011 | 2003 Cadillac CTS | $12,900.00 | $6,620.94 | 51.3% |
| 3GNEC16TX1G131378 | 1/19/2011 | 2001 Chevrolet Suburban 1500 | $9,900.00 | **$7,500.00** | **75.8%** |
| JT88F28G0W5019503 | 10/26/2011 | 1998 Lexus ES | $7,900.00 | **$5,878.00** | **74.4%** |
| 1N4AL11D76N317925 | 3/13/2011 | 2006 Nissan Altima | $9,600.00 | **$7,000.00** | **72.9%** |

**[*31]**

| | | | | | |
|---|---|---|---|---|---|
| 2GTEC19T221379039 | 3/20/2011 | 2002 GMC Sierra 1500 Ext | $9,900.00 | $5,225.00 | 52.8% |
| 1G1ZS52F75F186326 | 1/24/2011 | 2005 Chevrolet Malibu | $7,900.00 | $3,400.00 | 43.0% |
| 1GCEC14V71Z110517 | 4/2/2011 | 2001 Chevrolet Silverado 1500 | $7,900.00 | $3,400.00 | 43.0% |
| WDBLJ65G4WF034448 | 1/16/2011 | 1998 Mercedes Benz CLK | $7,900.00 | **$4,000.00** | **50.6%** |
| 19UUA56613A079444 | 2/27/2011 | 2003 Acura TL | $10,900.00 | $5,400.00 | 49.5% |
| 1D4GP24R768673012 | 12/11/2011 | 2006 Dodge Grand Caravan | $8,900.00 | $6,006.48 | 67.5% |
| 1LNHM87A52Y681048 | 10/9/2011 | 2002 Lincoln LS | $9,900.00 | $5,656.78 | 57.1% |
| JTEGH20V830095745 | 3/23/2011 | 2003 Toyota Rav4 | $10,400.00 | $5,700.00 | 54.8% |
| 1GNEC13RSYR151847 | 12/16/2011 | 2000 Chevrolet Tahoe | $7,900.00 | **$3,195.00** | **40.4%** |
| 1B3ESS6C04D502246 | 12/5/2011 | 2004 Dodge Neon | $5,900.00 | $2,700.00 | 45.8% |
| 4JGAB54E32A361975 | 11/5/2011 | 2002 Mercedes-Benz ML | $11,900.00 | $7,060.75 | 59.3% |
| WBXPA73455WC49424 | 9/6/2011 | 2005 BMW X3 | $16,400.00 | $10,800.00 | 65.9% |
| 1FAFP46V1WF177622 | 7/2/2011 | 1998 Ford Mustang | $9,900.00 | $5,500.00 | 55.6% |
| JN1CA21D7WT500657 | 6/4/2011 | 1998 Nissan Maxima | $6,900.00 | $3,680.00 | 53.3% |
| 2GCEC19W821132683 | 3/18/2011 | 2002 Chevrolet Silverado 1500 | $7,900.00 | $5,500.00 | 69.6% |
| JT8BD68S4X0060023 | 4/11/2011 | 1999 Lexus GS | $11,800.00 | **$5,730.00** | **48.6%** |
| 28KA43R16H416054 | 12/13/2011 | 2006 Dodge Charger | $11,900.00 | $7,950.77 | 66.8% |
| WBAAm3343YFP79893 | 3/31/2011 | 2000 BMW 3 Series | $8,900.00 | $5,149.39 | 57.9% |
| WBAXA73555B815676 | 4/4/2011 | 2005 BMW 5 Series | $16,400.00 | $9,000.00 | 54.9% |
| 1GCEC14X17Z174286 | 4/7/2011 | 2007 Chevrolet Silverado | $11,900.00 | $7,000.00 | 58.8% |
| 4JGAB72E41A265737 | 2/23/2011 | 2001 Mercedes-Benz ML | $12,900.00 | $6,800.00 | 52.7% |
| WBAAM5332XFR04559 | 4/2/2011 | 1999 BMW 3 Series | $10,900.00 | $4,922.25 | 45.2% |
| WDBRF64JXZE002046 | 2/12/2011 | 2002 Mercedes-Benz C Class | $10,900.00 | $10,300.00 | 94.5% |

**[*32]**

| VIN | Date | Vehicle | | | |
|---|---|---|---|---|---|
| 19UCA56832A041388 | 1/24/2011 | 2002 Acura TL | $9,900.00 | $6,362.48 | 64.3% |
| JS1VT54A252100524 | 4/5/2011 | 2005 Suzuki SV1000 | $8,900.00 | **$3,500.00** | **39.3%** |
| 2G1WE52E949161370 | 2/27/2011 | 2004 Chevrolet Impala | $7,900.00 | **$3,000.00** | **38.0%** |
| 1GNEC13TZYJ128631 | 5/14/2011 | 2000 Chevrolet Tahoe | $9,900.00 | $6,469.66 | 65.4% |
| 1GKEK13R2YR153099 | 2/20/2011 | 2000 GMC Yukon Denali | $9,900.00 | **$7,825.00** | **79.0%** |
| 1FMRC15W03LC49959 | 1/23/2011 | 2003 Ford Expedition | $10,900.00 | $5,136.38 | 47.1% |
| 1FMRU15W92LA97856 | 2/26/2011 | 2002 Ford Expedition | $8,900.00 | $4,149.18 | 46.6% |
| 3GYEK63N72G212753 | 2/19/2011 | 2002 Cadillac Escalade | $16,900.00 | $9,800.00 | 58.0% |
| JHLRD1842XC012624 | 7/2/2011 | 1999 Honda CR-V | $6,700.00 | **$3,000.00** | **44.8%** |
| 1GNDT13W5W2189117 | 8/20/2011 | 1998 Chevrolet Blazer | $4,900.00 | **$1,500.00** | **30.6%** |
| WAUJC68E93A206945 | 9/11/2011 | 2003 Audi A4 | $10,900.00 | **$7,500.00** | **68.8%** |
| 2GCEC19V911278807 | 9/23/2011 | 2001 Chevrolet Silverado 1500 | $10,400.00 | $5,870.64 | 56.4% |
| 2G1WB55K869169587 | 4/4/2011 | 2006 Chevrolet Impala | $10,900.00 | $6,925.00 | 63.5% |
| 1GYEC63%74R107886[10] | 1/6/2011 | 2004 Cadillac Escalade | $17,900.00 | $11,398.09 | 63.7% |
| 2HNYD18862H543966 | 11/12/2011 | 2002 Acura MDX | $9,900.00 | $4,900.00 | 49.5% |
| 1FMZU63E92ZC18759 | 8/18/2011 | 2002 Ford Explorer | $10,900.00 | $5,275.03 | 48.4% |
| 1GNEC13V04R193673 | 11/3/2011 | 2004 Chevrolet Tahoe | $13,900.00 | $11,841.83 | 85.2% |
| 1G8ZK52762Z178710 | 9/29/2011 | 2002 Saturn S-Series | $4,900.00 | **$2,315.00** | **47.2%** |
| WCBNG70J9VA069051 | 10/17/2011 | 2000 Mercedes Benz S Class | $11,900.00 | $5,700.00 | 47.9% |
| 2GCEC19V7X1225015 | 11/6/2011 | 1999 Chevrolet Silverado 1500 | $8,900.00 | **$4,500.00** | **50.6%** |
| JT88F28G8W5014288 | 8/20/2011 | 1998 Lexus ES | $5,900.00 | $3,800.00 | 64.4% |

---

[10] Some VINs listed in RA Kaplan's spreadsheets contain nonalphanumeric characters and/or more or fewer digits than 17. Those VINs are reproduced here although the Court believes them to contain transcription errors.

**[*33]**

| | | | | | |
|---|---|---|---|---|---|
| 3GTEC14X97G166310 | 6/11/2011 | 2007 GMC Sierra (Classic) | $10,900.00 | $6,580.00 | 60.4% |
| 1GNEC13R0YR142375 | 11/27/2011 | 2000 Chevrolet Tahoe | $4,900.00 | $3,608.01 | 73.6% |
| 2G1FP23G512134068 | 4/16/2011 | 2001 Chevrolet Camero | $12,900.00 | $7,300.00 | 56.6% |
| 1GTEC19T8YZ138294 | 1/24/2011 | 2002 GMC Sierra 1500 Ext | $10,900.00 | $5,850.00 | 53.7% |
| 1N4BL11E63C299096 | 9/18/2011 | 2003 Nissan Altima | $10,900.00 | $6,275.00 | 57.6% |
| 1G1BL52P8TR180649 | 8/27/2011 | 1996 Chevrolet Impala | $9,900.00 | $4,800.00 | 48.5% |
| 1D4GP24R16B711835 | 6/8/2011 | 2006 Dodge Grand Caravan | $7,900.00 | $5,425.00 | 68.7% |
| WBANA735X4B806051 | 1/27/2011 | 2004 BMW 5 Series | $19,900.00 | $14,341.43 | 72.1% |
| 1GNEC138R4YR179994 | 1/8/2011 | 2000 Chevrolet Tahoe | $12,900.00 | $4,900.00 | 38.0% |
| 3GNEC16TX3G117838 | 2/23/2011 | 2003 Chevrolet Suburban 1500 | $11,900.00 | **$8,800.00** | **73.9%** |
| 1GKEC13R4VJ743022 | 5/13/2011 | 1997 GMC Yukon | $7,499.00 | $3,618.33 | 48.3% |
| 3GYFK66N54G269052 | 2/14/2011 | 2004 Cadillac Escalade | $16,500.00 | $10,300.00 | 62.4% |
| 1GYEK63N02R189302 | 2/5/2011 | 2002 Cadillac Escalade | $18,900.00 | $7,705.00 | 40.8% |
| WBABM5346VJP03324 | 12/8/2011 | 2000 BMW 3 Series | $10,900.00 | $5,823.10 | 53.4% |
| 1GMDC23E83D237496 | 7/23/2011 | 2003 Pontiac Montana | $7,900.00 | $4,700.00 | 59.5% |
| JT8BH68X1Y0024159 | 8/25/2011 | 2000 Lexus GS | $10,500.00 | $5,775.00 | 55.0% |
| 19UUA56672A021319 | 7/16/2011 | 2002 Acura TL | $8,400.00 | **$5,800.00** | **69.0%** |
| 2GCEC19T821429281 | 5/15/2011 | 2002 Chevrolet Silverado 1500 | $9,600.00 | $5,066.74 | 52.8% |
| 5FNRL18092B022673 | 2/6/2011 | 2002 Honda Odyssey | $9,900.00 | $5,225.00 | 52.8% |
| 1GKFK66U02J214129 | 2/5/2011 | 2002 GMC Yukon XL 1500 | $13,900.00 | $8,431.87 | 60.7% |
| 1G1ND521X1M565436 | 12/15/2011 | 2001 Chevrolet Malibu | $5,900.00 | **$2,415.00** | **40.9%** |
| 1GKEK63R5YR207668 | 12/18/2011 | 2000 GMC Yukon Denali | $7,900.00 | **$3,695.00** | **46.8%** |
| WBAAN37461ND46851 | 10/15/2011 | 2001 BMW 3 Series | $10,900.00 | $4,378.17 | 40.2% |

| | | | | | |
|---|---|---|---|---|---|
| **[*34]** | | | | | |
| 1GYEK63N03R190841 | 8/4/2011 | 2003 Cadillac Escalade | $14,900.00 | $10,650.00 | 71.5% |
| 1GNEC13T6Y1164939 | 7/30/2011 | 2000 Chevrolet Tahoe | $9,900.00 | $5,651.93 | 57.1% |
| BDBNG70J4YA107933 | 8/2/2011 | 2000 Mercedes Benz S Class | $12,900.00 | $8,290.22 | 64.3% |
| 1FMZU63K73ZA54709 | 7/22/2011 | 2003 Ford Explorer | $9,900.00 | **$5,100.00** | **51.5%** |
| 5UXFA53542LP56586 | 2/20/2011 | 2002 BMW X5 | $15,225.00 | $11,304.22 | 74.2% |
| WDBNG70J32A291057 | 1/8/2011 | 2002 Mercedes-Benz S Class | $11,400.00 | $5,700.00 | 50.0% |
| 19UUA56612A015533 | 1/10/2011 | 2002 Acura TL | $10,300.00 | $6,759.99 | 65.6% |
| 1GKEK66U41J241528 | 2/22/2011 | 2001 GMC Yukon XL 1500 | $11,900.00 | $6,831.17 | 57.4% |
| SALNY22263A226964 | 7/20/2011 | 2003 Land Rover Freelander | $7,900.00 | $3,815.92 | 48.3% |
| JN1CA21D7TT726385 | 12/5/2011 | Nissan Maxima | $4,900.00 | **$3,900.00** | **79.6%** |
| 1G6DM57N730119028 | 3/30/2011 | 2003 Cadillac CTS | $9,900.00 | $7,000.00 | 70.7% |
| 1G6DM7NX30137409 | 3/18/2011 | 2003 Cadillac CTS | $13,400.00 | $8,688.33 | 64.8% |
| WDBNG70J92A252036 | 1/28/2011 | 2002 Mercedes-Benz S Class | $14,900.00 | $8,300.00 | 55.7% |
| 2HKRL18501H589947 | 3/12/2011 | 2001 Honda Odyssey | $9,900.00 | $5,100.00 | 51.5% |
| 1GKEC13T02R188787 | 8/10/2011 | 2002 GMC Yukon | $8,900.00 | **$5,525.00** | **62.1%** |
| 3VWTG69M11M109824 | 11/15/2011 | 2001 Volkswagen Jetta | $7,900.00 | **$3,565.00** | **45.1%** |
| JT8BF12G3T0186014 | 7/2/2011 | 1996 Lexus ES | $6,500.00 | $3,300.00 | 50.8% |
| WDBGA76E1PA120187 | 8/12/2011 | 1993 Mercedes-Benz 600SEC | $11,500.00 | $6,500.00 | 56.5% |
| WP1A829P54LA70364 | 12/20/2011 | 2004 Porsche Cayenne | $20,900.00 | $15,950.00 | 76.3% |
| 1GCEC14V02Z141416 | 7/24/2011 | 2002 Chevrolet Silverado 1500 | $11,900.00 | $6,208.43 | 52.2% |
| 2HNYD18693H541371 | 3/13/2011 | 2003 Acura MDX | $14,900.00 | **$12,000.00** | **80.5%** |
| WBAGN63493DR09737 | 2/11/2011 | 2003 BMW 7 Series | $20,400.00 | $12,000.00 | 58.8% |
| | | **Total (or Average)** | **$2,139,642.33** | **$1,224,592.71** | **56.4%** **(Average)** |

| [*35] | | APPENDIX B – *2012* | | | |
|---|---|---|---|---|---|
| **VIN** | **Date of Sale** | **Car** | **Sales Price** | **COGS** | **COGS Margin** |
| 1GKDT135832197556 | 12/29/2012 | 2003 GMC Envoy | $7,900.00 | **$5,500.00** | **69.6%** |
| 1G1NE52J016172210 | 12/22/2012 | 2001 Chevrolet Malibu | $4,900.00 | **$3,500.00** | **71.4%** |
| 1HGEM225031028044 | 6/2/2012 | 2003 Honda Civic | $10,700.00 | $6,000.00 | 56.1% |
| WBAFA535711M87951 | 8/26/2012 | 2001 BMW X5 | $11,900.00 | $5,000.00 | 42.0% |
| 1LNHM87A64Y665346 | 8/31/2012 | 2004 Lincoln LS | $7,900.00 | $5,262.31 | 66.6% |
| 1GCEC1417YZ109957 | 3/4/2012 | 2000 Chevrolet Silverado 1500 | $8,900.00 | $3,600.00 | 40.4% |
| JNKAY41E73M002256 | 3/8/2012 | 2003 Infiniti | $11,900.00 | $6,175.00 | 51.9% |
| JT81Z31C4P0011743 | 3/28/2012 | 1993 Lexus SC | $5,900.00 | **$1,500.00** | **25.4%** |
| 1GND5135532321711 | 3/4/2012 | 2003 Trail Blazer | $7,300.00 | $5,375.00 | 73.6% |
| WDBNG70391A176803 | 2/23/2012 | 2001 Mercedes-Benz C Class | $10,900.00 | $6,908.30 | 63.4% |
| WBAAV53421J593586 | 1/7/2012 | 2001 BMW 3 Series | $8,900.00 | $4,887.57 | 54.9% |
| 1N4AL11D95C266597 | 5/13/2012 | 2005 Nissan Altima | $10,900.00 | $6,890.20 | 63.2% |
| 1GKFK66U551255086 | 5/11/2012 | 2005 GMC Yukon XL 1500 | $16,400.00 | $11,500.00 | 70.1% |
| WBADT43471GF7530 | 6/30/2012 | 2001 BMW 5 Series | $9,900.00 | $5,040.00 | 50.9% |
| 5TDZT38A215053956 | 12/24/2012 | 2001 Toyota Sequoia | $10,900.00 | $5,600.00 | 51.4% |
| 1FMDU65W94ZA52519 | 11/20/2012 | 2004 Ford Explorer | $11,900.00 | $6,377.93 | 53.6% |
| 4JGAB72E41A265737 | 8/29/2012 | 2001 Mercedes-Benz ML Class | $11,900.00 | $6,266.11 | 52.7% |
| 1GTEK9T0XZ533846 | 7/24/2012 | 1999 GMC Sierra 1500 Extend | $9,900.00 | $4,840.00 | 48.9% |
| 1GCCS19W3Y8149987 | 6/2/2012 | 2000 Chevrolet S10 Ext. Cab | $6,900.00 | $2,400.00 | 34.8% |
| 1GCCS19W02852176 | 12/2/2012 | 2002 Chevrolet S10 Ext. Cab | $9,400.00 | **$4,700.00** | **50.0%** |
| JT88F22G6V0033300 | 4/1/2012 | 1997 Lexus ES | $9,900.00 | $5,840.00 | 59.0% |

| [*36] | | | | | |
|---|---|---|---|---|---|
| 1B7GG2A2515109577 | 5/27/2012 | 2001 Dodge Dakota Quad Cab | $5,900.00 | **$4,980.00** | **84.4%** |
| WDBNG705YA029033 | 3/20/2012 | 2000 Mercedes-Benz S Class | $10,900.00 | $4,911.28 | 45.1% |
| WBADT43421GX22705 | 3/20/2012 | 2001 BMW 5 Series | $10,900.00 | $5,516.65 | 50.6% |
| 4A3AA46G01E049505 | 7/5/2012 | 2001 Mitsubishi Galant | $5,900.00 | **$2,200.00** | **37.3%** |
| 1TJGF10U630161797 | 12/22/2012 | 2003 Lexus RX | $11,900.00 | $7,500.00 | 63.0% |
| WVWPD6381eP272622 | 12/17/2012 | 2003 Volkswagen Passat | $7,900.00 | $2,400.00 | 30.4% |
| WDBPJ75J02A020282 | 11/27/2012 | 2002 Mercedes Benz CL Class | $7,500.00 | $7,000.00 | 93.3% |
| 2GCEC19V921108786 | 11/12/2012 | 2002 Chevrolet Silverado 1500 | $7,900.00 | **$6,640.00** | **84.1%** |
| SAJEA51D23XD53602 | 9/8/2012 | 2003 Jaguar X-Type | $7,900.00 | $3,973.76 | 50.3% |
| 1GCCS19W118196909 | 5/10/2012 | 2001 Chevrolet S10 Ext. Cab | $10,900.00 | $5,600.00 | 51.4% |
| 2GCED19W421375519 | 8/4/2012 | 2002 Chevrolet Silverado 1500 | $8,900.00 | $5,040.00 | 56.6% |
| WDBJF55F8%J006266 | 8/7/2012 | 1996 Mercedes Benz E Class | $3,000.00 | $3,300.00 | 110.0% |
| WP1AB29P924LA76684 | 6/3/2012 | 2004 Porsche Cayenne | $18,900.00 | **$16,000.00** | 84.7% |
| 1N4BL11D43C250115 | 5/26/2012 | 2003 Nissan Altima | $10,900.00 | $5,430.56 | 49.8% |
| WDBRF64J13F308855 | 3/14/2012 | 2003 Mercedes Benz C Class | $11,900.00 | $5,900.00 | 49.6% |
| 1NXBR32EX32131423 | 3/8/2012 | 2003 Toyota Corolla | $8,900.00 | $5,775.00 | 64.9% |
| 3VWRC29M7XM058806 | 2/10/2012 | 1999 Volkswagen Jetta | $6,500.00 | **$3,300.00** | **50.8%** |
| 1TLKT324950214885 | 2/10/2012 | 2005 Scion | $10,900.00 | $6,875.00 | 63.1% |
| WBAEV53453KM27991 | 3/30/2012 | 2003 BMW 3 Series | $8,900.00 | $771.42 | 8.7% |
| 1GNC513WSY2121580 | 5/18/2012 | 2000 Chevrolet Blazer | $5,900.00 | **$1,520.00** | **25.8%** |
| 1GYEK1388VR159950 | 5/11/2012 | 2000 Cadillac Escalade | $8,900.00 | **$3,395.00** | **38.1%** |
| 1G2WK52142F134604 | 8/5/2012 | 2002 Pontiac Grand Prix | $8,900.00 | $2,225.00 | 25.0% |
| WBAAM5332XFR08501 | 5/26/2012 | 1999 BMW 3 Series | $9,900.00 | $4,272.30 | 43.2% |

| [*37] | | | | | |
|---|---|---|---|---|---|
| WBADM6348XGU02578 | 9/7/2012 | 1999 BMW 5 Series | $6,900.00 | $2,500.00 | 36.2% |
| JT8UF11E680198059 | 12/30/2012 | 1994 Lexus LS | $9,900.00 | $499.30 | 5.0% |
| 1FMBU17L611829745 | 2/1/2012 | 2001 Ford Expedition | $8,900.00 | **$4,545.00** | **51.1%** |
| 1FAFP34322W260174 | 11/22/2012 | 2002 Ford Focus | $6,900.00 | $2,810.00 | 40.7% |
| 2T1CE22PG32023068 | 9/11/2012 | 2003 Toyota Solara | $8,900.00 | $4,025.00 | 45.2% |
| JT88H68X1Yoo24159 | 10/3/2012 | 2000 Lexus GS | $8,900.00 | $5,990.00 | 67.3% |
| WBADT63491CF05951 | 9/5/2012 | 2001 BMW 5 Series | $9,900.00 | $3,995.00 | 40.4% |
| 1GNEC13T71J108448 | 8/13/2012 | 2001 Chevrolet Tahoe | $8,900.00 | $6,000.00 | 67.4% |
| 2C4GM68465R367995 | 1/18/2012 | 2005 Chrystler Pacifica | $10,900.00 | $5,179.04 | 47.5% |
| WDBJF55F6VJ030620 | 3/26/2012 | 1997 Mercedes Benz E Class | $7,900.00 | **$4,900.00** | **62.0%** |
| 2A8GM68X47R145042 | 2/16/2012 | 2007 Chrystler Pacifica | $12,900.00 | $7,605.00 | 59.0% |
| WDB8F405A562092 | 4/20/2012 | 2004 Mercedez Benz C Class | $12,900.00 | $8,240.00 | 63.9% |
| 3VWSK69M85M015357 | 9/23/2012 | 2005 Volkswagen Jetta | $10,900.00 | **$5,140.00** | **47.2%** |
| 1GTEC14V522229605 | 8/16/2012 | 2002 GMC Sierra 1500 Reg. Cab | $10,900.00 | **$5,000.00** | **45.9%** |
| WBAEV33442P055030 | 1/28/2012 | 2002 BMW 3 Series | $7,500.00 | $4,900.00 | 65.3% |
| 1GCEK19%E1E107728 | 3/13/2012 | 2001 Chevrolet Silverado 1500 | $9,500.00 | $4,000.00 | 42.1% |
| 3VWBK21C31M469988 | 3/23/2012 | 2001 Volkswagen Beetle | $7,900.00 | $4,400.00 | 55.7% |
| WBAMA735748059251 | 2/20/2012 | 2004 BMW 5 Series | $16,900.00 | $10,995.00 | 65.1% |
| WDBRF61J33A536406 | 9/20/2012 | 2003 Mercedes Benz C Class | $10,900.00 | $6,946.57 | 63.7% |
| WAUJC68E45A119800 | 11/20/2012 | 2005 Audi A4 | $9,900.00 | $5,500.00 | 55.6% |
| 2HKRL18982H523148 | 9/14/2012 | 2002 Honda Odyssey | $10,100.00 | $4,840.00 | 47.9% |
| 2G1WT58K779164147 | 2/4/2012 | 2007 Chevrolet Impala | $8,900.00 | $3,610.43 | 40.6% |
| 1GKES16S346151663 | 2/13/2012 | 2004 GMC Envoy XL | $10,000.00 | $4,645.00 | 46.5% |

**[*38]**

| | | | | | |
|---|---|---|---|---|---|
| 1FMZU63W532A53447 | 1/4/2012 | 2003 Ford Explorer | $10,900.00 | $5,700.00 | 52.3% |
| WBAAM3341YCA89810 | 3/14/2012 | 2000 BMW 3 Series | $8,600.00 | $5,300.00 | 61.6% |
| JTHBD182910003343 | 2/17/2012 | 2001 Lexus IS | $9,900.00 | **$5,940.00** | **60.0%** |
| JT88D68S9W0026609 | 5/16/2012 | 1998 Lexus GS 300 | $9,900.00 | $3,725.00 | 37.6% |
| WDBRF64J62E005008 | 1/24/2012 | 2002 Mercedez Benz C Class | $10,900.00 | $5,509.11 | 50.5% |
| WDBNF7019YA033881 | 12/23/2012 | 2000 Mercedes-Benz S Class | $11,900.00 | $6,140.00 | 51.6% |
| 5FNRL18693B016619 | 10/30/2012 | 2003 Honda Odyssey | $10,900.00 | $6,017.35 | 55.2% |
| 1LNHM8653YY602589 | 10/26/2012 | 2000 Lincoln LS | $6,900.00 | $3,500.00 | 50.7% |
| 1HGCM72644A002945 | 11/3/2012 | 2004 Honda Accord | $8,900.00 | $4,810.90 | 54.1% |
| 1GNEK13T51R158818 | 9/30/2012 | 2001 Chevrolet Tahoe | $8,500.00 | $4,940.00 | 58.1% |
| WBADT43452G644699 | 8/13/2012 | 2002 BMW 5 Series | $9,900.00 | **$4,300.00** | **43.4%** |
| 2CGCEK19T3Y1287241 | 7/1/2012 | 2000 Chevrolet Silverado 1500 | $7,400.00 | $5,097.95 | 68.9% |
| 5J6YH18573L010748 | 6/11/2012 | 2003 Honda Element | $11,000.00 | $8,469.20 | 77.0% |
| 1GCEC14XX27142557 | 2/4/2012 | 2002 Chevrolet Silverado 1500 | $9,900.00 | $4,800.00 | 48.5% |
| 2G1WJ115K779402999 | 11/24/2012 | 2007 Chevrolet Monte Carlo | $3,900.00 | $2,800.00 | 71.8% |
| 1FAFP33P82W225238 | 8/12/2012 | 2002 Ford Focus | $5,400.00 | **$5,900.00** | **109.3%** |
| WDBNG70J52A299256 | 8/20/2012 | 2002 Mercedez Benz C Class | $11,400.00 | $6,827.81 | 59.9% |
| 1G6EL12Y8XU614791 | 5/7/2012 | 1999 Cadillac Eldorado | $7,400.00 | **$3,600.00** | **48.6%** |
| 4T1BF22K9XU086814 | 2/11/2012 | 1999 Toyota Camry | $7,900.00 | **$2,885.00** | **36.5%** |
| JT8UF11E1N0109766 | 3/16/2012 | 1992 Lexus LS | $4,900.00 | $2,000.00 | 40.8% |
| 2G1WX15K429290606 | 10/7/2012 | 2002 Chevrolet Monte Carlo | $6,900.00 | $2,615.00 | 37.9% |
| 1GCCS146268270580 | 3/30/2012 | 2006 Chevrolet Colorado Reg. | $3,000.00 | $3,995.00 | 133.2% |
| 1GNEC13T64R194583 | 1/23/2012 | 2004 Chevrolet Tahoe | $9,900.00 | $6,340.00 | 64.0% |

39

| [*39] | | | | | |
|---|---|---|---|---|---|
| 5UXFA53573LV97077 | 9/6/2012 | 2003 BMW X5 | $12,900.00 | $6,140.00 | 47.6% |
| 1FMFU19525LA69115 | 12/2/2012 | 2005 Ford Expedition | $11,900.00 | $4,600.00 | 38.7% |
| JN1DA31A52T307353 | 5/28/2012 | 2002 Nissan Maxima | $9,900.00 | $5,400.00 | 54.5% |
| WDBNG7512YA040242 | 7/27/2012 | 2000 Mercedes-Benz S Class | $12,900.00 | $5,745.28 | 44.5% |
| 1N4AL11032C202504 | 7/29/2012 | 2002 Nissan Altima | $8,900.00 | **$6,000.00** | **67.4%** |
| 1FMYU02144KB06454 | 9/8/2012 | 2004 Ford Escape | $5,900.00 | $4,200.00 | 71.2% |
| WBAAM3349YFP72673 | 6/9/2012 | 2000 BMW 3 Series | $9,900.00 | $5,100.00 | 51.5% |
| 1ZVFT84N775215746 | 4/7/2012 | 2007 Ford Mustang | $14,900.00 | $10,650.91 | 71.5% |
| 1GNEC13T04R111391 | 2/5/2012 | 2004 Chevrolet Tahoe | $12,900.00 | $7,904.48 | 61.3% |
| 1GYEK13R8YR159950 | 8/20/2012 | 2002 Cadillac Escalade | $9,400.00 | **$3,395.00** | **36.1%** |
| YV1R5G1R012044405 | 11/23/2012 | 2001 Volvo S60 | $7,800.00 | **$3,300.00** | **42.3%** |
| JT2EL55D050019620 | 2/17/2012 | 1995 Toyota Tercel | $3,900.00 | **$1,850.00** | **47.4%** |
| 1LNHM87A73Y668898 | 6/17/2012 | 2003 Lincoln LS | $10,900.00 | $6,912.90 | 63.4% |
| WBADT43413G031457 | 11/20/2012 | 2003 BMW 5 Series | $11,300.00 | **$6,340.00** | **56.1%** |
| JT8CH32Y3T0050758 | 12/11/2012 | 1996 Lexus SC | $5,900.00 | $1,800.00 | 30.5% |
| JTEDW21AU70022671 | 12/16/2012 | 2007 Toyota Highlander | $12,900.00 | **$8,000.00** | **62.0%** |
| 1FMRU15L13LA38727 | 7/10/2012 | 2003 Ford Expedition | $11,750.00 | $6,500.00 | 55.3% |
| WDBL165G4WF034448 | 6/18/2012 | 1998 Mecerdes Benz CLK | $6,900.00 | **$4,000.00** | **58.0%** |
| 1FMFU18L73LB23425 | 6/23/2012 | 2003 Ford Expedition | $10,900.00 | $6,340.00 | 58.2% |
| JT88H68XeY0024577 | 3/31/2023 | 2000 Lexus GS | $8,900.00 | **$6,625.00** | **74.4%** |
| 1FMYU01111KA70431 | 1/20/2012 | 2001 Ford Escape | $4,500.00 | **$4,000.00** | **88.9%** |
| 1G6EL12Y8XU614791 | 4/1/2012 | 1999 Cadillac Eldorado | $7,900.00 | $3,600.00 | 45.6% |
| JT2BF28K0Y0251324 | 1/20/2012 | 2000 Toyota Camry | $7,900.00 | $3,595.00 | 45.5% |

| [*40] | | | | | |
|---|---|---|---|---|---|
| 1GCEK19T61E220105 | 12/27/2012 | 2001 Chevrolet Silverado 1500 | $8,900.00 | $3,500.00 | 39.3% |
| 1GKES165636145838 | 4/23/2012 | 2003 GMC Envoy | $10,900.00 | $6,524.00 | 59.9% |
| 2HGES26782H521810 | 7/29/2012 | 2002 Honda Civic | $9,400.00 | $5,045.00 | 53.7% |
| 2T1CG22P4YC345600 | 1/11/2012 | 2000 Toyota Solara | $7,400.00 | $4,550.00 | 61.5% |
| JN8A208T93W109670 | 1/8/2012 | 2003 Nissan Murano | $11,800.00 | $7,300.00 | 61.9% |
| 1GCEK19T3YE336162 | 12/16/2012 | 2000 Chevrolet Silverado 1500 | $9,700.00 | **$5,000.00** | **51.5%** |
| 3GKFK16T9YG118698 | 7/2/2012 | 2000 GMC Yukon XL 1500 | $8,900.00 | $3,625.00 | 40.7% |
| WBAEV3312KL77125 | 12/16/2012 | 2002 BMW 3 Series | $9,900.00 | $4,739.45 | 47.9% |
| 1GKFK66U913198787 | 12/17/2012 | 2001 GMC Yukon XL 1500 | $11,900.00 | **$6,500.00** | **54.6%** |
| 2B3KA43RX7H606999 | 11/15/2012 | 2007 Dodge Charger | $15,900.00 | **$10,500.00** | **66.0%** |
| JT8BD6850X0063744 | 10/14/2012 | 1999 Lexus GS | $9,500.00 | $4,440.00 | 46.7% |
| 1FMRU17W23LC31802 | 6/27/2012 | 2003 Ford Exposition | $12,900.00 | $6,540.00 | 50.7% |
| WBAAM3346YCA89897 | 4/21/2012 | 2000 BMW 3 Series | $10,500.00 | $5,445.00 | 51.9% |
| WBAGJ8325WDM15370 | 8/31/2012 | 1998 BMW 7 Series | $6,900.00 | **$3,750.00** | **54.3%** |
| WDBDA68FSXF174512 | 2/23/2012 | 1999 Mercedes Benz SL Class | $11,900.00 | $7,603.23 | 63.9% |
| KNDUP132856713927 | 2/11/2012 | 2005 Kia Sedona | $7,900.00 | **$5,800.00** | **73.4%** |
| 1GKFK66U93J164822 | 9/19/2012 | 2003 GMC Yukon XL 1500 | $11,700.00 | $5,700.00 | 48.7% |
| 1LNHM86S93Y698575 | 4/1/2012 | 2003 Lincoln LS | $9,900.00 | $4,125.00 | 41.7% |
| 2G2FV32G822163170 | 4/28/2012 | 2002 Pontiac Firebird | $10,900.00 | $6,275.00 | 57.6% |
| 1FMZU65W42ZC45793 | 4/8/2012 | 2002 Ford Explorer | $7,900.00 | $3,400.00 | 43.0% |
| SALME114X4A175892 | 4/3/2012 | 2004 Land Rover Range Rover | $17,900.00 | $13,265.00 | 74.1% |
| JT1GF10U81016619 | 7/4/2012 | 2001 Lexus RX | $10,900.00 | $5,980.28 | 54.9% |
| 2GIWF52E419291567 | 1/27/2012 | 2001 Chevrolet Impala | $3,000.00 | **$3,065.00** | **102.2%** |

| [*41] | | | | | |
|---|---|---|---|---|---|
| 3VWRK69M83M121173 | 1/1/2012 | 2003 Volkswagen Jetta | $7,900.00 | $3,400.00 | 43.0% |
| 1GCCS1441X8206708 | 3/12/2012 | 1999 Chevrolet S10 Regular Cab | $6,900.00 | $2,915.00 | 42.2% |
| 2B3LA43G47H636812 | 2/24/2012 | 2007 Dodge Charger | $12,900.00 | $8,205.00 | 63.6% |
| 1FMYU01111KA70431 | 6/12/2012 | 2001 Ford Escape | $5,900.00 | **$4,000.00** | **67.8%** |
| 1GNEC3TS1R154099 | 12/23/2012 | 2001 Chevrolet Tahoe | $11,900.00 | **$6,000.00** | **50.4%** |
| 2G1WB58KD69161673 | 9/29/2012 | 2006 Chevrolet Imapal | $8,900.00 | $3,700.00 | 41.6% |
| 2HKRL18602H522999 | 12/17/2012 | 2002 Honda Odyssey | $10,900.00 | $5,400.00 | 49.5% |
| 1GTEC19VD5Z120496 | 11/20/2012 | 2005 GMC Sierra 1500 Ext. Cab | $12,400.00 | $4,500.00 | 36.3% |
| 19UYA42673A005785 | 8/23/2012 | 2003 Acura CL | $7,900.00 | **$5,000.00** | **63.3%** |
| 19UUA56903A013042 | 8/27/2012 | 2003 Acura IL | $9,900.00 | $4,600.00 | 46.5% |
| WAULC68E52A047672 | 7/28/2012 | Audi A4 | $9,050.00 | $5,840.00 | 64.5% |
| WDBNG70J12A234596 | 6/30/2012 | 2002 Mercedes Benz S Class | $12,900.00 | **$9,000.00** | **69.8%** |
| 1D4GP24R17B244031 | 5/19/2012 | 2007 Dodge Grand Caravan | $6,900.00 | $4,545.00 | 65.9% |
| 1FMCU03172KD66885 | 1/15/2012 | 2002 Ford Escape | $9,650.00 | $4,711.81 | 48.8% |
| WBAFA53541LM72632 | 9/12/2012 | 2001 BMW X5 | $11,900.00 | $6,350.00 | 53.4% |
| JTHBF30G625031425 | 10/31/2012 | 2002 Lexus ES | $7,500.00 | $7,137.69 | 95.2% |
| 1GKFK66UDLH88004 | 8/18/2012 | 2001 GMC Yukon XL 1500 | $8,900.00 | $6,044.03 | 67.9% |
| 1DrHD38K65F506843 | 5/24/2012 | 2005 Dodge Duragno | $10,900.00 | $4,868.31 | 44.7% |
| 1FAHP3439VW257533 | 4/15/2012 | 2000 Ford Focus | $5,900.00 | **$4,000.00** | **67.8%** |
| SAJEA01U63HM53146 | 3/18/2012 | 2003 Jaguar S-Type | $10,900.00 | $7,179.97 | 65.9% |
| WDB1F65H1XA814293 | 2/7/2012 | 1999 Mercedes Benz E Class | $6,900.00 | $4,000.00 | 58.0% |
| 2T1CG22P1YC321366 | 5/17/2012 | 2000 Toyota | $6,900.00 | $3,150.00 | 45.7% |
| 2C8GM68424R633431 | 11/13/2012 | 2004 Chrysler Pacifica | $9,400.00 | **$5,740.00** | **61.1%** |

| [*42] | | | | | |
|---|---|---|---|---|---|
| 3VWBC21C4YM452169 | 9/25/2012 | 2000 Volkswagon Beetle | $6,900.00 | $2,300.00 | 33.3% |
| SALNE22274A296497 | 5/29/2012 | 2004 Land Rover Freelander | $7,700.00 | $3,725.00 | 48.4% |
| WBABM3348YJN85314 | 4/12/2012 | 2000 BMW 3 Series | $8,900.00 | $5,000.00 | 56.2% |
| JTJHF100210195012 | 4/9/2012 | 2001 Lexus RX | $10,400.00 | $6,500.00 | 62.5% |
| WAUED2809XA208487 | 3/15/2012 | 1999 Audi A4 | $6,900.00 | $3,600.00 | 52.2% |
| JTJHF100110230915 | 3/11/2012 | 2001 Lexus RX | $12,400.00 | $7,200.00 | 58.1% |
| JN8AZ08T24W221955 | 3/3/2012 | 2004 Nissan Murano | $9,400.00 | $7,797.80 | 83.0% |
| 1LNHM865S12Y705369 | 1/25/2012 | 2002 Lincoln LS | $4,600.00 | $3,357.00 | 73.0% |
| 5LMFL2567LJ14259 | 1/17/2012 | 2007 Lincoln Navigator L | $25,150.00 | $19,125.49 | 76.0% |
| 1GYDE637X40138966 | 4/19/2012 | 2004 Cadillac SRX | $12,700.00 | $6,152.70 | 48.4% |
| 3VWTH69M13M038799 | 9/14/2012 | 2003 Volkswagen Jetta | $9,400.00 | **$3,695.00** | **39.3%** |
| 2B3KA43R06H390658 | 9/13/2012 | 2006 Dodge Charger | $11,900.00 | **$5,500.00** | **46.2%** |
| 1GCCS145018151314 | 9/30/2012 | 2001 Chevrolet S10 Reg. Cab | $7,500.00 | $2,493.77 | 33.3% |
| 1GCCS19W0Y8105302 | 11/4/2012 | 2000 Chevrolet S10 Ext. Cab | $6,400.00 | $2,210.00 | 34.5% |
| 1GCCS19W818156438 | 8/12/2012 | 2001 Chevrolet S10 Ext. Cab | $9,900.00 | $4,840.00 | 48.9% |
| 1GCEC14X232231511 | 3/29/2012 | 2003 Chevrolet Silverado 1500 | $10,900.00 | $6,475.00 | 59.4% |
| SFNRL180738086678 | 5/19/2012 | 2003 Honda Odyssey | $7,300.00 | **$5,540.00** | 75.9% |
| 1D4HD48D84F216710 | 2/2/2012 | 2004 Dodge Durango | $12,900.00 | $6,900.00 | 53.5% |
| 2D4GP44L17R175057 | 2/19/2012 | 2007 Dodge Grand Caravan | $8,900.00 | $4,500.00 | 50.6% |
| JT8BF22GXV0029797 | 1/29/2012 | 1997 Lexus ES | $7,900.00 | **$4,295.00** | **54.4%** |
| 1G1ZH57B69F149455 | 4/3/2012 | 2009 Chevrolet Malibu | $13,500.00 | $10,000.00 | 74.1% |
| 4T3ZF13C2WU010017 | 5/13/2012 | 1998 Toyota Sienna | $8,900.00 | **$3,000.00** | **33.7%** |
| 1FMDU65W52ZA89029 | 7/7/2012 | 2002 Ford Explorer | $9,900.00 | $3,100.94 | 31.3% |

| [*43] | | | | | |
|---|---|---|---|---|---|
| WDBNG7S151A211944 | 11/29/2012 | 2001 Mercedes Benz S Class | $11,900.00 | **$4,240.00** | **35.6%** |
| 1FAFP53U91G121593 | 12/22/2012 | 2001 Ford Taurus | $3,999.00 | **$2,000.00** | **50.0%** |
| JTGHF10U0X0035004 | 11/12/2012 | 1999 Lexus RX | $9,900.00 | **$5,000.00** | **50.5%** |
| 1N4AL11D65C129830 | 5/27/2012 | 2005 Nissan Altima | $9,500.00 | $6,020.00 | 63.4% |
| SAL1V124XXA562312 | 2/4/2012 | 1999 Land Rover Discovery | $6,900.00 | $2,430.03 | 35.2% |
| 2CNDL73F156090514 | 5/6/2012 | 2005 Chevrolet Equinox | $10,295.00 | $4,438.25 | 43.1% |
| JT8UF11ESM0094834 | 11/10/2012 | 1991 Lexus LS | $5,900.00 | $2,892.83 | 49.0% |
| JN1CA31D1Yt509833 | 10/16/2012 | 2000 Nissan Maxima | $4,000.00 | $2,595.00 | 64.9% |
| 1YVFP84DX45N84864 | 9/26/2012 | 2004 Mazda 6 | $10,900.00 | $4,440.00 | 40.7% |
| 1G1YY0781F5101589 | 7/31/2012 | 1985 Chevrolet Corvette | $2,900.00 | **$4,000.00** | **137.9%** |
| 1GNEC16T421334654 | 6/7/2012 | 2002 Chevrolet Suburban 1500 | $8,900.00 | $3,325.00 | 37.4% |
| WDBRF64J61F04792 | 7/25/2012 | 2001 Mercedes Benz C Class | $11,900.00 | $6,375.00 | 53.6% |
| WBAG163452DP54799 | 10/5/2012 | 2002 BMW 7 Series | $15,900.00 | $8,649.19 | 54.4% |
| 5TDZT38A925079780 | 10/21/2012 | 2002 Toyota Sequoia | $10,900.00 | $5,545.00 | 50.9% |
| 1GCEC14T5XZ113066 | 6/5/2012 | 1999 Chevrolet Silverado 1500 | $7,700.00 | $4,550.98 | 59.1% |
| 2GCEC19V921328610 | 5/23/2012 | 2002 Chevrolet Silverado 1500 | $8,900.00 | $4,900.00 | 55.1% |
| 3GNDA13D375543081 | 3/16/2012 | 2007 Chevrolet HHR | $8,900.00 | **$4,200.00** | **47.2%** |
| 3VWRC29M1YM115793 | 2/15/2012 | 2000 Volkswagen Jetta | $6,900.00 | $3,000.00 | 43.5% |
| WDBRF61JX1F069131 | 4/14/2012 | 2001 Mercedes Benz C Class | $9,900.00 | $5,800.00 | 58.6% |
| 2G1WH55K449255183 | 2/26/2012 | 2004 Chevrolet Impala | $9,900.00 | $4,345.00 | 43.9% |
| YU1RS61R712059371 | 12/5/2012 | 2001 Volvo S60 | $7,900.00 | $2,000.00 | 25.3% |
| WDBNG75J7YA066299 | 5/19/2012 | 2000 Mercedes-Benz S Class | $10,900.00 | $3,300.00 | 30.3% |
| WDBLJ65GGXF098699 | 9/21/2012 | 1999 Mercedes Benz CLK Class | $7,900.00 | $3,115.00 | 39.4% |

| [*44] | | | | | |
|---|---|---|---|---|---|
| 1FMFU18L73LB25160 | 7/23/2012 | 2003 Ford Explorer | $11,900.00 | $5,840.00 | 49.1% |
| 2G1WX15K349242890 | 6/12/2012 | 2004 Chevrolet Monte Carlo | $3,900.00 | $2,800.00 | 71.8% |
| 1GKFK66U41J174459 | 6/6/2017 | 2001 GMC Yukon XL 1500 | $10,900.00 | **$5,490.00** | **50.4%** |
| 1N4BL11D02C707419 | 5/3/2012 | 2002 Nissan Altima | $9,700.00 | $6,267.50 | 64.6% |
| WDBRF61J83A480625 | 3/3/2012 | 2003 Mercedes Benz C Class | $10,900.00 | $5,975.00 | 54.8% |
| 2HKRL1861YH613675 | 10/27/2012 | 2000 Honda Odyssey | $10,900.00 | **$8,500.00** | **78.0%** |
| 1GNEC13T81R111389 | 9/2/2012 | 2001 Chevrolet Tahoe | $8,900.00 | **$4,500.00** | **50.6%** |
| JT8UZ30C150040723 | 5/4/2012 | 1995 Lexus SC | $5,500.00 | $2,095.00 | 38.1% |
| YV1R553D212058074 | 8/23/2012 | 2001 Volvo 560 | $9,300.00 | $4,165.70 | 44.8% |
| 1GKEK13R8WJ710836 | 7/28/2012 | 1998 GMC Yukon | $6,900.00 | $1,550.00 | 22.5% |
| JT8GK13T150100226 | 11/20/2012 | 1995 Lexus ES | $7,900.00 | $2,410.00 | 30.5% |
| 3VWSD29M61M030839 | 6/14/2012 | 2001 Volkswagen Jetta | $6,500.00 | $3,995.00 | 61.5% |
| 1FAFP53U91G121593 | 8/16/2012 | 2001 Ford Taurus | $6,900.00 | $2,544.71 | 36.9% |
| KNDJD733735051400 | 8/1/2012 | 2003 Kia Sorento | $9,900.00 | $5,861.27 | 59.2% |
| WBAAM3346YCB24891 | 4/2/2012 | 2000 BMW 3 Series | $7,500.00 | **$5,000.00** | **66.7%** |
| WBAAV334X1FU85345 | 6/29/2012 | 2001 BMW 3 Series | $5,900.00 | $3,395.00 | 57.5% |
| 1HGCG22431A035567 | 7/2/2012 | 2001 Honda Accord | $7,900.00 | $4,540.00 | 57.5% |
| 19UUA56652A036028 | 6/7/2012 | 2002 Acura TL | $8,700.00 | $3,615.00 | 41.6% |
| 3VWSA69M35M014510 | 3/3/2012 | 2005 Volkswagen Jetta | $9,900.00 | $4,700.00 | 47.5% |
| JN8DR09X71W568112 | 4/22/2012 | 2001 Nissan Pathfinder | $8,900.00 | **$4,300.00** | **48.3%** |
| 1GYEK13R3XR418195 | 4/14/2012 | 1999 Cadillac Escalade | $8,900.00 | $4,065.00 | 45.7% |
| SAJPD1845XC871938 | 4/14/2012 | 1999 Jaguar XJ Series | $7,000.00 | $6,146.22 | 87.8% |
| WVWMD23B6YP301860 | 4/15/2012 | 2000 Volkswagen Passat | $5,900.00 | **$3,500.00** | **59.3%** |

| [*45] | | | | | |
|---|---|---|---|---|---|
| JT2EL55D050019620 | 2/20/2012 | 1995 Toyota Tercel | $3,400.00 | **$1,850.00** | **54.4%** |
| 2GCEC19T321239565 | 2/25/2012 | 2002 Chevrolet Silverado 1500 | $8,900.00 | $5,475.00 | 61.5% |
| JHMBB6247XC004043 | 2/17/2012 | 1999 Honda Prelude | $8,000.00 | $4,887.19 | 61.1% |
| WFMDA516X5BA51814 | 2/4/2012 | 2005 Ford Freestar | $7,900.00 | $2,854.18 | 36.1% |
| 1GMES165846172768 | 11/26/2012 | 2004 Chevrolet Trailblazer | $11,900.00 | $5,640.00 | 47.4% |
| WAUJC68E64A144955 | 9/13/2012 | 2004 Audi A4 | $12,900.00 | $5,240.00 | 40.6% |
| 1GTEC19TSYZ160995 | 7/23/2012 | 2000 GMC Sierra 1500 Ext | $9,400.00 | $4,840.00 | 51.5% |
| JT88068S7Y0100953 | 3/21/2012 | 2000 Lexus GS | $11,900.00 | $5,700.00 | 47.9% |
| WBADT43432GZ97212 | 6/2/2012 | 2002 BMW 5 Series | $10,900.00 | $4,240.00 | 38.9% |
| JTHFN48Y020031361 | 6/18/2012 | 2002 Lexus CS | $12,900.00 | $8,805.57 | 68.3% |
| 5UXFA53592LP48001 | 4/16/2012 | 2002 BMW X5 | $15,900.00 | $11,051.40 | 69.5% |
| 1FMFU18516LA28588 | 3/14/2012 | 2006 Ford Exposition | $17,650.00 | $7,301.18 | 41.4% |
| 2G1WF52E659145676 | 2/14/2012 | 2005 Chevrolet Impala | $8,400.00 | $4,511.71 | 53.7% |
| 1B3ES26CX2D556763 | 9/28/2012 | 2002 Dodge Neon | $6,900.00 | $1,695.00 | 24.6% |
| 2GCECL19TX11385038 | 7/22/2012 | 2001 Chevrolet Silverado 1500 | $8,900.00 | $3,595.00 | 40.4% |
| 1GCEK19TS1E159832 | 8/1/2012 | 2001 Chevrolet Silverado 1500 | $10,000.00 | $4,882.00 | 48.8% |
| | | **Total (or Average)** | **$2,298,644.00** | **$1,238,416.00** | **54.2% (Average)** |